Orville Powers, Plaintiff-Appellee, v. Richard Kelley, d/b/a Glenda's 601 Club, Harry Soffer, Clara Soffer and Harry Kelley, d/b/a Kelly's 722 Tavern, a/k/a Kelley's, Defendants-Appellants.

Gen. No. 66–115.

Fifth District.

June 6, 1967.

Strubinger, Burke, Keller & Davis, of Belleville, for appellants.

Listeman, Bandy & Hamilton, of East St. Louis, for appellee.

EBERSPACHER, J.

This action was brought by plaintiff, Orville Powers, under section 135, chapter 43, Ill Rev Stats 1963 (Dram Shop Act) for personal injuries allegedly sustained by plaintiff when he was allegedly assaulted by Eddie 'Arink and another identified as Barney, who had been served alcoholic liquor by defendants causing them to become intoxicated in whole or in part. Defendants admitted owning and operating a tavern but denied that plaintiff had sustained injury as a proximate result of the intoxication of any of their patrons. At the close of plaintiff's evidence, the court directed a verdict in favor of defendant Harry Kelley, d/b/a Kelly's 722 Tavern, and no appeal has been taken from that order. The jury rendered a verdict in favor of plaintiff in the amount of $12,000 on which judgment was entered, from which defendants Richard Kelley, d/b/a Glenda's 601 Club and Harry Soffer and Clara Soffer, owners of the real estate in which the tavern business of Richard Kelley was operated, appeal.

Defendant Richard Kelley, called by plaintiff, testified that he had been acquainted with Eddie Arink for two or three years, and that Eddie Arink and a person identified as Barney were on December 26, 1964, at Glenda's

601 Club in East St. Louis, for two or three hours during the afternoon, drinking and playing the bowling machine; that while Kelley was eating his supper in a nearby restaurant, a party came from his tavern and advised of trouble there and that upon his return he saw Arink slap the barmaid. Kelley tried to talk to Arink to no avail, so he grabbed Arink and took him to the door when Barney attacked Kelley. The final result was that Kelley ejected both Arink and Barney and told them to stay out. Kelley left the tavern to return to his supper, but was called back later when a shooting occurred.

Plaintiff Powers testified that as it was getting dusk on December 26, he stopped at Richard Kelley's tavern, was sitting on a stool, and a few minutes after a drink had been served to him, the door opened behind him and someone said, "Is Rich here?", the barroom became quiet, and the barmaid in a loud, shrill voice said, "He ain't here." He then turned on the bar stool, or may have stepped off it, and discovered Eddie Arink and another man standing there, Arink holding a shotgun, the other a rifle; both fired, the shotgun blast striking plaintiff on the left arm and left leg. Powers had known Arink slightly but had never had any trouble with him. On cross-examination, upon being asked whether it stood to reason that an acquaintance would come into a tavern and shoot him down without cause, Powers answered, "I can answer that, yes, sir. His wife came up to the hospital and apologized. She said Eddie was sorry, it was a mistake. That's all I know."

A captain of the East St. Louis police department testified on behalf of plaintiff that he was called to the tavern, and was informed by Mr. Kelley and the barmaid "that there had been a shooting and that two men were in the tavern drinking and Kelley told them that they had had enough to drink and for them to go home. Then they argued a little bit and they left, and about a half hour later they came back and stood in the doorway

and fired some shots, two shots, in the tavern." Upon being asked whether he had learned the names of the men who had done the shooting, after refreshing his recollection from his report, he named Eddie Arink and a man named Barney. Referring to his report, the witness had spelled out the name A-r-i-n-k. On cross-examination the captain admitted that he was not sure who had told him of the shooting and the incident of the ejection of the two men and their subsequent return, but that the names of the parties who did the shooting, according to his report, were Eddie Arink and Barney. The captain stated that he did not know "where they are." On cross-examination, in answer to a question as to whether the parties were apprehended the witness answered that there was a car stopped later that night, in which there was a woman. On redirect he stated that according to his report the occupant of the car was the wife of Eddie Arink.

A patron of the tavern called by plaintiff, testified that he was at the tavern at the time Kelley "had the two boys leave," and saw Kelley take them to the door; he was also present later when he glanced around and saw two men with guns, heard the shot, but could not say that they were the same two men he had seen ejected earlier.

After the foregoing plaintiff's witnesses had testified, plaintiff's counsel sought leave to read the evidence deposition of Eddie Arink, to which objection was made; the objections were heard in chambers. The objections were, first, that a proper foundation had not been laid, showing that the deponent was not available for testimony in person nor amenable to subpoena, second, that there was no showing that the deponent Edward Errink was one and the same person as was referred to by the police captain's testimony as Eddie Arink. (Other witnesses had not attempted to spell out the name, and it is spelled A-r-i-n-k throughout the record, with the exception of the

deposition) and lastly on the ground that defendants were deprived of the right to interrogate the deponent as to the circumstances relating to the shooting at Glenda's 601 Club by virtue of the fact the deponent refused to answer certain questions on the grounds that the answers might tend to incriminate him; contending that deponent improperly exercised the constitutional privilege, since deponent had previously read and signed a statement concerning his activities on December 26 which was not incriminating. No motion was made to suppress the deposition in advance of trial, nor did defendants move for an order compelling answers, as is provided by Supreme Court Rule 19–12; neither did defendants in the post-trial motion or their brief object to the fact that the deposition had not been filed with the clerk.

The court overruled the objections and permitted the deposition to be read to the jury. Here, defendants urge these objections as grounds for their contention that the trial court erred in admitting into evidence the deposition of Edward Errink. Pursuant to notice, served on defendants' attorneys, that the evidence deposition of Edward Arink would be taken on October 29, 1965, in St. Louis, Missouri, the evidence deposition of Edward Errink was taken at that time and place, with all parties being represented by counsel. The deponent stated his name to be Edward Errink (so spelled by the reporter, but not spelled out by anyone purporting to know the correct spelling) residing at 3415 Osage, St. Louis, Missouri. He further stated he had known plaintiff for four or five years, had known Richard Kelley a like time, was in Richard Kelley's tavern for five or six hours on December 26th where he had about 15 highballs, was bowling on a machine for drinks, when he got involved in a fight, and he and Barney were pistol-whipped by Richard Kelley, and that he next remembered being in his car while it was still daylight. Upon being asked wheth-

er he returned to the tavern later that day, his personal counsel advised the deponent not to answer and the question was withdrawn. On cross-examination by these defendants' counsel, the deponent, on the advice of his personal counsel, refused to answer questions as to whether he returned to the tavern, or recalled having been in the tavern later that evening when the shooting occurred.

■ ■ According to all ordinary rules of pronunciation, the two names "Arink" and "Errink" may be sounded alike, and to us it is clear that under the doctrine of "idem sonans" applied in this case, they should be held to designate the same person, even though spelled differently. Defendants' attorneys responded to the notice of the taking of the deposition of Edward Arink and were present when the deposition was taken, and at that time did not question the identity of the deponent. From this record we can only conclude that the police captain who spelled the name out, the reporter who took the deposition and the court reporter at the trial heard the same sound but spelled it differently. This is a classic situation for application of the rule—that if a name when pronounced, conveys practically the same sound as the correct name, as correctly pronounced, the misspelling of the name is not a variance and no advantage can be taken of the clerical error. See ILP, Names, § 4.

■ ■ The guaranty against compulsory incrimination provided by both the Constitution of the United States (Fifth Amendment) and article 2, section 10 of the Constitution of the State of Illinois, is not limited to criminal cases and may be invoked in proceedings of a civil nature. Brown v. U. S., 234 F2d 140, affd 356 US 148, 2 L Ed2d 589; City of Chicago v. Lord, 3 Ill App2d 410, 122 NE2d 439, affd 7 Ill2d 379, 130 NE2d 504. The deponent was not a party to the proceedings, and not under plaintiff's control. To contend as these

defendants do, that Supreme Court Rule 19–12, which provides a remedy for parties aggrieved by the refusal of a deponent to answer, was not available to them because they did not learn of a statement given to another defendant's attorney until the motion to read the deposition was made, is of little persuasive effect when such statement had been in the hands of one of the defendants in the suit during the preparation for trial; and while the statement might be said to impeach the deponent's refusal to answer certain questions, it did not impeach any testimony, and was properly denied admission.

 Prior to the adoption of the present Rule, 101.-19–10, (c 110, § 101.19–10, Ill Rev Stats 1963),[1] the law with reference to admitting into evidence a deposition, was provided by chapter 51 of the Illinois Revised Statutes, pertaining to evidence and depositions. The leading case of Jacobs v. Mutual Life Ins. Co., 341 Ill App 293, 93 NE2d 516, had held that whether or not a deposition should be allowed into evidence at the trial of a matter depended upon the status of the deponent at the time of the taking of the deposition. As is pointed out

---

[1] The pertinent parts of which are: "(1) In General.—Any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or to whom due notice thereof was served, in accordance with any of the following provisions.

"(2) . . .

"(3) Evidence Depositions.—(a) All or any part of any evidence deposition may be used for any purpose for which a discovery deposition may be used. (b) All or any part of an evidence deposition, whether or not the deponent is a party may be used for any purpose if the court finds that at the time of trial: (i) the deponent is dead; or (ii) the deponent is out of the county, unless it appears that the absence of the deponent was procured by the party offering the deposition; . . ."

in the Historical and Practice Notes following Rule 19–10 in the Illinois Annotated Statutes, subsection (3) of the rule altered the prior rule, to now provide that the test of the deponent's status is applied at the time of trial. Here the court was advised by statement of counsel, and it was shown by the deposition itself, that the deponent resided in St. Louis, Missouri, on the date it was taken, October 29, 1965, almost six months before the trial. The presumption of continuation of residence is well known in the law—residence once established is presumed to continue until the contrary is shown. In re McCalmont, 16 Ill App2d 246, 148 NE2d 23; People v. Estate of Robert Moir, 207 Ill 180, 69 NE 905; In re Estate of Dedmore, 257 Ill App 519; in each of these cases the court held that there is a presumption of continued residence, and the burden of proof to show a change of residence is upon the party asserting such change. The showing of residence of the deponent outside St. Clair County, and in fact outside the State, raised the presumption of continuance of residence in Missouri, and as a resident of Missouri the deponent was not amenable to subpoena. C 110, § 62, Ill Rev Stats 1963.

■ On this point appellants contend that John v. Tribune Co., 28 Ill App2d 300, 171 NE2d 432, is in point. There the deponent had been a resident of the city of Chicago, and an employee of the attorneys for the defendant testified that he attempted to serve the deponent with a subpoena the day before commencement of the trial, but did not find her at the place where she had previously been arrested. Another witness testified that deponent's attorneys advised she was living in Wisconsin, but no effort was made to locate her there. The court permitted the deposition to be read, and the Appellate Court held the deposition was improperly admitted because of a lack of a showing that the attendance of the absent witness could not have been procured by

the use of reasonable diligence. In the present case, no such showing was necessary in view of the presumption of continued residence in Missouri, and deponent's not being amenable to summons. Had there been a showing that deponent had resided in St. Clair County in the present case, it would have become incumbent upon plaintiff to have made a showing, upon which the court could have based a finding; but with the presumption of continued residence in Missouri and appellants' failure to overcome the presumption, we cannot say that the court abused its discretion in admitting the deposition. That the court failed to enter a specific finding, but ruled "I will let it in" and overruled defendants' objections, after hearing the arguments and being fully advised, does not vitiate the ruling, although the court may have failed to make the specific finding which appellants urge the rule contemplates.

An examination of the record convinces us that the court properly denied defendants' motions for directed verdict, and that the verdict was not against the manifest weight of the evidence. The testimony that plaintiff Powers and Arink had never had a cross word, and the fact that numerous witnesses for defendant as well as Kelley testified they did not know what Arink was drinking, does not restrict the jury to the inference that his drinks were nonalcoholic—particularly when Kelley has testified that he ejected Arink and Barney because they were slapping the barmaid and admitted that he told them he "wouldn't serve them any more, it was time to go home." The jury, from their own experience, had probably never known of a tavern keeper ejecting a patron, or refusing to serve him, because he had overindulged in nonalcoholic beverages, or slapping the barmaid as a result of the effervescence of soda pop.

Contending that the verdict is excessive upon the evidence and clearly the result of prejudice and

passion on the part of the jury, appellants point out that plaintiff admitted a preexisting injury to his little finger, and has made an excellent recovery and although there was testimony that plaintiff had lost function in his hand, he is still able to engage in the carpenter trade at no loss of income, and that his leg injury has not hampered his employment. With reference to plaintiff's injuries, plaintiff's doctor testified that his diagnosis was multiple gunshot wounds to the left forearm and left knee; that the knee was pretty well riddled but the fracture to the knee was not nearly so severe as he had anticipated; that he felt the atrophy of the left forearm was due to an injury to the nerves that supplied portions of two fingers and his thumb. Plaintiff was hospitalized 28 days, there were 6 pellet marks on his arm, and more than a hundred on his leg. Plaintiff testified that he was unable to work for 4½ months, and had been working regularly as a carpenter earning $4.57½ per hour; that when he returned to work the hourly rate was $4.67½; that he was now unable to carry out all the duties of his carpentry work, required assistance and was unable to climb; that at the time of trial, 2 or 3 fingers of his left hand were still numb and his leg was still swelling and was not trustworthy; that his leg had bothered him continuously since he was shot, and hurt him at the time of trial; that it tires easily and when tired causes him to limp, and that he has missed 12 days' work since returning to rest his leg. There was ample evidence of pain and suffering, atrophy and numbness of the arm and fingers, disfigurement and injury to the leg; the lost wages amounted to approximately $3,294, a hospital bill of $568.30, the doctor bill was not put into evidence. While reasonable men might differ on the amount to be allowed for pain and suffering, or the future effect on his earnings, we cannot say that the jury was moved by passion or prejudice, and we find no basis to depart from

the usual rule that the assessment of damages is the preeminent function of the jury.

We therefore affirm the judgment of the Circuit Court of St. Clair County.

Affirmed.

MORAN and GOLDENHERSH, JJ., concur.