Harrell Crabb, Plaintiff-Appellee, v. Robert R. Anderson Company, an Illinois Corporation, Defendant-Appellant.

Gen. No. 50,651.

First District, First Division.

September 25, 1967.

Rehearing denied October 18, 1967.

Hinshaw, Culbertson, Moelmann & Hoban, of Chicago (Leonel I. Hatch and D. Kendall Griffith, of counsel), for appellant.

Milroy R. Blowitz and Robert J. Hellgeist, of Chicago (Sidney Z. Karasik, of counsel), for appellee.

MR. JUSTICE ADESKO delivered the opinion of the court.

Plaintiff, Harrell Crabb, was an ironworker employed by Hunter Construction Company, (Hunter). Hunter subcontracted to do structural steel work for Robert R. Anderson Company, (Anderson), general contractors, who were constructing an overpass at the Northwest

Expressway and Milwaukee Avenue, in Chicago, Illinois. While on the construction site, Crabb, was injured when a jib fell from a crane and struck him on the head. Plaintiff's claim against Anderson is based on violation of the Structural Work Act (Ill Rev Stats 1965, c 48, §§ 60–69). The jury returned a verdict in favor of plaintiff in the sum of $50,000. Judgment was entered on the verdict and Anderson appeals. No questions are raised as to the pleadings.

Defendant contends (1) that there was no evidence that it had charge of the erection of the viaduct within the meaning of the Structural Work Act; (2) that there was no evidence that the alleged violation of the Structural Work Act was the direct or proximate cause of the occurrence in question; (3) that the verdict was against the manifest weight of the evidence; (4) that improper conduct of plaintiff's attorney was prejudicial; (5) that it was error to allow testimony regarding surgery performed on the plaintiff; and (6) that the damages awarded by the jury were excessive.

On August 26, 1958, Hunter entered into a contract with Anderson to supply labor, equipment and material to erect a bridge at the intersection of the Northwest Expressway and Milwaukee Avenue. One of the pieces of equipment used on the construction site was a Lima 50-ton crane with a 60-foot boom. Attached to the end of the boom, at an angle, was an arm or extension, approximately 20 feet long and called a "jib." The jib weighed 1,500 to 2,000 pounds and was attached to the end of the boom by cables and a pin.

The crane was placed in a "cut" or trench which had been excavated by Anderson. The "cut" was ⅞ of a mile long and 200 to 250 feet wide. The crane was being used to lift and move large steel girders. A girder had just been placed and the crane was moving back to pick up another girder when the jib fell off the boom and

struck plaintiff, crushing his hard plastic hat and as one witness described it, "his head was laid open completely."

Anderson insists that it did not have "charge of" the work as required by section 9 of the Scaffold Act to render it liable. (Ill Rev Stats 1965, c 48, § 69.) Anderson states in its brief that it was not "in charge of the operation involving the alleged violation which occurred during the erection of the structural steel for the Milwaukee Avenue overpass bridge or viaduct. . . . There is no evidence that anyone other than a Hunter employee directed the operation of the crane. . . . This occurrence arose out of the operation of a crane. The defendant was not operating the crane."

Section 9 of the contract between Hunter and Anderson provided as follows:

> "Coordination of Work. The Sub-Contractor agrees to perform the work hereunder diligently, properly and in such manner as the Contractor may determine will best coordinate with the work of the Contractor, other sub-contractors and contractors, and the Contractor shall at all times have access to the work for necessary inspection to insure compliance herewith. The Sub-Contractor shall immediately remove any of his employees objectionable to the Contractor, Owner and other sub-contractors."

The treasurer of Anderson testified with respect to the duties of the job superintendent it employed:

> "His main duty was to see that the job ran smoothly, that everything was programmed correctly, and that a sub-contractor would move in at the right time along with the progress of the job."

The ironworker superintendent for Anderson also testified that the duties of Anderson's job superintendent were to oversee the whole job and go around from day to day and make sure every person there was on schedule.

Anderson's job superintendent admitted in cross-examination that all the subcontractors were responsible to the general contractor and were instructed when to begin their work.

Clifton Voight was Hunter's job supervisor. He testified that "Anderson had notified the office for Hunter Construction and they had sent me on the job to start the erection of steel." When he arrived on the job, Voight was shown the piers that were ready for placing of the steel girders.

The crane had been spotted in the "cut" Anderson had excavated and there was substantial testimony by several witnesses that it was quite muddy and filled with holes. As the crane lifted and moved the steel girders, it tilted as much as five feet because of the condition of the ground on which it was located. There was conflicting testimony on whether the crane was standing on wooden platforms at the time of the accident. Those witnesses who claimed that the crane was on platforms could not agree if the platforms belonged to Hunter or Anderson.

Anderson's argument, that because it did not operate the crane, it has no liability under the Scaffold Act, is not in accord with the definition of "having charge of" as set forth in Larson v. Commonwealth Edison Co., 33 Ill2d 316, 211 NE2d 247 (1965). In Larson the Supreme Court stated (pp 321–322):

> "The term 'having charge of' is a generic term of broad import, and although it may include supervision and control, it is not confined to it. As was said of the word 'charge' in People v. Gould, 345 Ill 288, 323: 'The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have care of.' Thus, while the actual exercise of super-

vision and control over the work and the persons doing it, or the retention of the right to so supervise and control, may be factors bearing on the ultimate factual question of whether an owner is 'in charge,' they are not necessary or conclusive factors, nor is either made a sine qua non for liability under the statute. Rather, consistent with its beneficent purpose of preventing injury to persons employed in the extrahazardous occupation of structural work, the thrust of the statute is not confined to those who perform, or supervise, or control, or who retain the right to supervise and control, the actual work from which the injury arises, but, to insure maximum protection, is made to extend to owners and others who have charge of the erection or alteration of any building or structure."

Thus in the recent case of Miller v. DeWitt, 37 Ill2d 273, 226 NE2d 630 (1967), an architect was held as "having charge" of the work under the Scaffold Act because he had the right under the contract to stop the work.

In Sola v. City of Chicago, 82 Ill App2d 266, 227 NE2d 102 (1967) an argument similar to that advanced in the instant case was rejected.

"The City contends that the accident occurred in the operation of the crane, run by a contractor's employee at the direction of the crew foreman. In light of a recent Supreme Court decision, Miller v. DeWitt, 37 Ill2d 273, 226 NE2d 630, decided January 19, 1967, that fact would not necessarily rule out defendant's liability." (P 274.)

■■ The Larson case as well as Miller, Sola and Kobus v. Formfit Co., 35 Ill2d 533, 221 NE2d 633 (1966), direct that the issue of whether a defendant is in charge of the construction within the meaning of the Scaffold

Act is a question of fact. In accordance with these authorities, the issue was submitted to the jury for their determination. As indicated by the evidence detailed above, the determination of the jury that Anderson was "in charge of" the construction is not against the manifest weight of the evidence.

■ Anderson next contends that the alleged violations of the Scaffold Act were not the direct or proximate cause of the occurrence. The Scaffold Act requires that a crane used in construction "be so erected and constructed, placed and operated as to give proper and adequate protection to life and limb of any person or persons employed or engaged thereon or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." (Ill Rev Stats 1965, c 48, § 60.)

Defendant admits in its brief that plaintiff's evidence disclosed "that the site where the crane was located was muddy so that the crane sank in the mud; that no floats or platforms which would have prevented the sinking of the crane were used." This however, argues defendant, was not the cause of the occurrence. It is defendant's theory that the accident was caused by the whip line catching onto the jib and pulling it off as the hook and headache ball were being raised.

The Complaint alleged that there was a failure to operate the crane so as to give adequate and proper protection to the plaintiff. The evidence was that the crane was being operated on a muddy and uneven area and that it should be set on level areas. There was no conflicting evidence on this point. Whether the hook and headache ball were moving at the time the jib fell was open to question. We are thus left with a factual situation in which reasonable men might arrive at different conclusions. Such questions are appropriately left to the fact finding body. Ney v. Yellow Cab Co., 2 Ill2d 74, 117 NE2d 74 (1954).

297

Anderson's next contention is that it was prejudiced by the conduct of plaintiff's counsel. The post-trial motion points to over 375 places in the record where it is alleged plaintiff's counsel made improper remarks, attempted to testify himself to facts not in evidence, asked improper questions and discussed points of law to the jury. Plaintiff counters in his brief that defendant's counsel deliberately provoked certain of the improper remarks, injected improper matters into the record, and conducted improper impeachment. It would serve no useful purpose to go into detail with respect to each alleged error. We have carefully considered all the arguments and reviewed the entire record which covers over 1,600 pages of testimony and eight days of trial. The trial judge promptly ruled on all objections that were made, struck improper testimony and accurately instructed the jury on such issues. We note that he exercised his judicial discretion so as to conduct a fair and impartial trial although often forced to reprimand both counsel to cease their constant bickering.

██ The ultimate question is not whether the trial was scrupulously free of all error but whether any error occurred, which prejudiced the defendant. Nelson v. Union Wire Rope Corp., 31 Ill2d 69, 199 NE2d 769 (1964); Whitman v. Prescott, 80 Ill App2d 49, 225 NE2d 384 (1967). After reviewing the record we find no reason to believe that the verdict of the jury was the result of any alleged misconduct by plaintiff's counsel.

██ Anderson next contends that the trial court committed error in permitting plaintiff to testify that in February, 1963, he was in the Pasadena Bay Shore Hospital and a Dr. Ashkenazy performed, under local anesthetic, an operation on his lower back. This was the full extent of the testimony. Dr. Ashkenazy did not testify as to what he did but plaintiff's counsel promised to tie up this testimony.

Without reciting the extensive medical testimony elicited from the five medical witnesses in this cause, suffice it to say that there was some testimony regarding extensive injury to plaintiff's head, neck, elbow, cervical region, shoulder and hip. He had difficulty in walking and some lumbar involvement.

The plaintiff's testimony complained of, and the nature of it is very slight in light of the entire record. We do not believe that defendant was prejudiced when one considers the extensive injuries suffered by plaintiff. The situation here is not similar to that in Miller v. Chicago Transit Authority, 3 Ill App2d 223, 121 NE2d 348 (1954) and Gordon v. Checker Cab Co., 334 Ill App 313, 79 NE2d 632 (1948), both cited by defendant. In those cases the defendant by innuendo and under the guise of impeachment attempted to show that the plaintiff was a malingerer and had been involved in previous accidents. That is not involved here.

■ The final argument raised by Anderson is that the damages awarded by the jury are excessive. As a general rule, a court of review will not interfere with the discretion of the jury in its assessment of damages. Powers v. Kelly, 83 Ill App2d 289, 227 NE2d 376 (1967). Prior to the accident plaintiff was a healthy and able ironworker. Since being smashed on the head by a jib from a 50-ton crane, he has no longer been able to function in his job and has suffered recurring dizziness, walks with difficulty and has pain in his neck, shoulder, arm, left leg and left side. Specific items of damages proven amounted to $3,600.

In Barango v. Hedstrom Coal Co., 12 Ill App2d 118, 138 NE2d 829 (1957), a verdict for $75,000 was sustained where the plaintiff had $4,000 in out of pocket expenses. In that case, the court stated (p 138):

"The question before us is as to whether or not the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience."

Considering the extensive injuries suffered by plaintiff, we do not find the verdict so large as to require reversal. For the foregoing reasons the judgment and verdict of the Circuit Court are affirmed.

Judgment affirmed.

MURPHY, P. J. and BURMAN, J., concur.