Kristine Rasmussen, Administratrix of Estate of Carl Rasmussen, Deceased, Plaintiff-Appellee, v. Harley Clark, Defendant-Appellant.

Gen. No. 10,525.

Opinion filed March 4, 1952. Released for publication March 24, 1952.

SNYDER, CLARKE & DALZIEL, of Waukegan, for appellant; DANIEL J. DALZIEL, of Waukegan, of counsel.

JOSEPH D. RYAN, LOUIS G. DAVIDSON, and LOUIS P. MILLER, all of Chicago, and WESLEY G. CAREY, of Waukegan, for appellee.

MR. PRESIDING JUSTICE DOVE delivered the opinion of the court.

Kristine Rasmussen as the administratrix of the estate of Carl Rasmussen, deceased, instituted this suit against the defendant, Harley Clark, in the circuit court of Lake county, to recover for the alleged wrongful death of her son. Her complaint consisted of two counts. The first Count charged the defendant with negligence in the operation of his truck at the time and place in question, and the second Count charged him with wilful and wanton misconduct. The answer of the defendant denied the allegations of negligence and those of wilful and wanton misconduct and asserted, as an affirmative defense, that the plaintiff had no legal capacity to sue because at the time of the accident in question, plaintiff's intestate was engaged in the course of his duties as an employee of Lake county and was at such time and place covered by the provisions of the Workmen's Compensation Act of the State of Illinois and that the defendant was also engaged in the course of his duties as an employee of Lake-Cook Farm Supply Company and was likewise covered by the Workmen's Compensation Act of this State. Plaintiff, by her reply to this affirmative defense, denied that the defendant was covered by the Workmen's Compensation Act.

A trial by jury was had on the issues as thus made, which trial resulted in a verdict in favor of the plaintiff and against the defendant in the sum of $12,500. Judgment was entered on this verdict by the trial court after overruling motions for a new trial and for judgment

183

notwithstanding the verdict. To reverse this judgment defendant appeals.

At the trial this special interrogatory was submitted to the jury: "Do you find that the defendant was an employee of the Lake-Cook Farm Supply Company, a corporation, and acting as such an employee within the scope of his employment by the Lake-Cook Farm Supply Company, a corporation, at the time and place of the accident in question?" The jury answered "No" to this special interrogatory.

It was stipulated that plaintiff's intestate at the time of the accident was engaged in the course of his employment and died of injuries received while he was so engaged and that he was covered by the Workmen's Compensation Act of this State. The evidence shows that the Lake-Cook Farm Supply Company was engaged in the business of hauling and conveying inflammable and dangerous fluids and was, therefore, covered by the Workmen's Compensation Act. (Ill. Rev. Stat. 1949, chap. 48, sec. 139) [Jones Ill. Stats. Ann. 143.18]. The important question for determination is, therefore, whether or not the defendant was an employee of the Lake-Cook Farm Supply Company at the time of the accident. If he was such an employee, section 29 of the Workmen's Compensation Act applies and any cause of action resulting from the death of plaintiff's intestate was transferred to the deceased's employer and the recovery for such death is limited to the actual amount of compensation payable under the Compensation Act. If, however, defendant was an independent contractor and not an employee of the Lake-Cook Farm Supply Company, section 29 of the Workmen's Compensation Act does not apply, and plaintiff properly had a right to bring this action. (Ill. Rev. Stat. 1949, chap. 48, sec. 166) [Jones Ill. Stats. Ann. 143.44].

The accident in question occurred on September 23, 1949. Carl Rasmussen, plaintiff's intestate, was an em-

ployee of the Lake County Highway Department, and at about 12:40 p. m. on the day of the accident he was working on a two-lane blacktop paved rural highway in conjunction with another county highway department employee. This rural highway runs in a generally east and west direction, and these two men were engaged in filling the area close to the edge of the blacktop pavement with gravel. The accident happened on a wide curve. The two men were working on the south edge of the pavement as the defendant approached them in his truck travelling in an easterly direction. Plaintiff's intestate and his fellow employee had dumped gravel from a truck which they were using over a distance of some 80 to 100 feet along the south edge of the road. Their truck had then been parked on the shoulder of the road off of the highway. Carl Rasmussen, plaintiff's decedent, after the truck had been parked, had walked back to the west end of the strip of gravel which had been dumped along the edge of the highway and was pulling the loose gravel which had splashed out onto the pavement over to the shoulder using a metal broom. The defendant struck him with his truck, throwing his body about 75 feet east and 20 feet south of the point of collision. The truck which had been parked by these two highway maintenance men on the shoulder of the road was also struck by defendant's truck damaging it considerably and tearing off parts of the equipment on the defendant's truck. After striking plaintiff's intestate and the county highway truck, he, the defendant, continued on down the road without stopping, and shortly thereafter the defendant was found at his home in an alleged drunken condition.

The errors assigned and argued on this appeal are that the general verdict in favor of the plaintiff and also the special finding that the defendant was not an employee of Lake-Cook Farm Supply Company and

acting within the scope of his employment at the time and place of the accident are contrary to the manifest weight of the evidence; that the verdict of the jury for $12,500 is excessive; and, finally, that counsel for plaintiff indulged in improper and prejudicial arguments to the jury.

The Lake-Cook Farm Supply Company is a co-operative enterprise. It services and sells such merchandise as feed, plant food, petroleum products, oil, and grease for farm use. Its members consist almost entirely of farmers living in the area where it operates and who share in its profits, if any. It has a bulk plant at Grayslake, where it has large storage tanks in which it stores gasoline and other products which are held for resale to its customers. It also has an office and warehouse in Lake county. Salesmen are employed by it to sell and distribute its products, and delivery of its products are made by trucks.

Whether the defendant, who was one of the salesmen who sold and distributed the products of this company, was an independent contractor or was an employee of the company is the first question to be determined upon this appeal. There was a written contract between the defendant and the Lake-Cook Farm Supply Company. Plaintiff asserts that this contract between the defendant and this company and the practical interpretation placed upon it by them shows that the defendant was an independent contractor. Counsel for appellant insists that the contract proves that he was an employee of the company and not an independent contractor. The contract is a printed form designated "Petroleum Trucksalesman's Agreement." This contract was introduced in evidence, and by its provisions the company agreed to employ defendant to sell its merchandise within a certain territory, which was defined in the contract, and the defendant accepted the employment. The company was obligated to deliver its mer-

chandise to the defendant. The merchandise delivered to the trucksalesman was to remain the property of the company until it was paid for or sold and delivered to the customer. The salesman was required to furnish the truck chassis and all of the necessary equipment, with the exception of a tank, at his own cost and expense, and the company was, according to the contract, "in no way or manner responsible or liable for such equipment." The salesman was required by the contract to procure his own automobile or truck license in his own name and at his own expense and to procure and maintain liability and indemnity insurance on the truck and its equipment. The company was required to pay one-third of the premium for this insurance. The salesman's compensation was to be on a commission basis and in accordance with a schedule attached to the contract. Sales of the company's merchandise, according to the contract, were to be made on a cash basis only, except that the salesman could extend credit until the first of the month following the day of the sale. The contract provided that this extension of credit was to be at the risk of the salesman. Any credit extended by him which was not paid by the second month was charged back to the salesman and collected out of his earned but unpaid commissions. All such unpaid accounts were assigned by the company to the salesman, after which they became his property. Either party had a right to cancel the agreement upon fifteen days' notice. The salesman was required to devote his entire time to the business of the company, and he agreed to comply with the instructions given to him by the company and with its rules and regulations. The contract further required the salesman to keep records of all his sales and deliveries and to account for the merchandise delivered by the company to him or for the proceeds from the sale of merchandise.

The defendant entered into this contract on March 1, 1947, but first commenced working for the company about the year 1937 and had been employed continuously by it from that date to the time of the accident. He was not required to report at the company's place of business at any particular time, nor were the hours that he was to devote to the selling of the company's products fixed, nor was he required to follow any particular methods or procedure in selling. The evidence shows that occasionally a representative of the company went with him to call on customers living within the territory assigned to defendant and to help defendant in promoting the sale of the company's products. Only instructions general in their nature were ever given by the company to the defendant. The time, the manner, and the methods to be used by him in selling were left to his judgment. By the contract, he agreed that he would comply with all of the rules and regulations of the company, but there was no reservation in the contract by the company of the right to direct him in his daily operations. As before stated, the truck and delivery equipment belonged to defendant, while the tank belonged to the company. The name of the company appeared on the truck. The defendant obtained his products at the company's bulk plant or warehouse, where they were charged to him by quantity and not in money value. These products he would sell and distribute in the territory assigned to him at the prices fixed by the company. Frequently customers would order directly from the company, but these orders were turned over to the defendant and filled by him. He was not permitted to keep his commission out of his receipts but had to turn in all of the receipts and later was paid his commission by the company. The company paid a social security tax on the defendant, and it withheld from his commission a certain amount for income tax. If he did work for the company other than

selling its products, he was compensated separately for this. If he extended credit, this was done at his own risk and on his own responsibility. He was the sole judge as to whether credit should be extended. About eight o'clock on the morning of the accident he had called at the bulk plant of the company and had been told that an order had come by telephone from a Dr. Keuner's farm for some gasoline, which he was to deliver. He delivered this gasoline about a half hour before the accident. Customers frequently telephoned him at his residence and placed orders, which he subsequently delivered. The foregoing is a fair statement of the substance of the evidence in this record bearing on the relationship of the defendant to the Lake-Cook Farm Supply Company.

██ One who asserts an affirmative defense has the burden of proof upon the defense asserted and must maintain such defense by a preponderance of the evidence. (*Frazier v. Allison,* 315 Ill. App. 253, 257.) This rule applies to a defense asserted under the Workmen's Compensation Act. (*Victor v. Dehmlow,* 405 Ill. 249.)

██ In *Darner v. Colby,* 375 Ill. 558, at 560, the Supreme Court set forth many of the principles by which it is determined whether or not one is an independent contractor or an employee. The language of the court on this subject is as follows:

"An independent contractor is one who renders service in accordance with the will of the person for whom the work is done, only as to the result of the work and not as to the means by which it is accomplished. (*Hartley v. Red Ball Transit Co.* 344 Ill. 534; *Besse v. Industrial Com.* 336 id. 283; *Nelson Bros. & Co. v. Industrial Com.* 330 id. 27.) Where one undertakes to produce a given result without being in any way controlled as to the method by which he attains it, he is considered an independent contractor rather than an employee.

189

(*Hartley v. Red Ball Transit Co. supra; Rosenbaum Bros. v. Devine,* 271 Ill. 354.) Where the one employed to do the work, in the course of which the injury occurs, is free to exercise his own judgment and discretion as to the means and appliances which he may see proper to employ in so doing, entirely exclusive of the control and direction of the party for whom the work is being done, he is deemed, in law, an independent contractor. (*Pioneer Construction Co. v. Hansen,* 176 Ill. 100; *Jefferson v. Jameson & Morse Co.* 165 id. 138.) The right to control the manner of doing the work is of principal importance in the consideration of the question whether the worker is an employee or an independent contractor. (*Decatur Railway and Light Co. v. Industrial Board,* 276 Ill. 472.) The test is in the right to control and not the fact of whether actual interference with the method of doing the work is shown by the evidence. If the person for whom the work is being done retains the right to control the manner in which the work is to be done, the relation of employer and employee exists. *Meredosia Levee and Drainage Dist. v. Industrial Com.* 285 Ill. 68.''

██ As has been frequently pointed out, whether a person is an employee or an independent contractor is difficult to determine for the reason that certain elements pertaining to both relationships occur in the same set of facts. This is to say certain elements present in any given situation are indicative of an employer-employee status, while other factors present in the same situation indicate the individual in question is an independent contractor. We have read the cases cited by the plaintiff and defendant in their briefs on this subject, and, from our study of these cases, we have reached the conclusion that the facts in this case are more like those in *Springer v. Illinois Transit Lines, Inc.,* 318 Ill. App. 403, and *Jones v. Standerfer,* 296 Ill. App. 145, than any others, and especially the

*Springer* case. It is true that in the *Springer* case there was only an oral contract, and it is also true that Springer had the right, and exercised that right, of hiring and discharging helpers, which, as is pointed out in several cases, is an *indicia* of an independent contractor. This right to hire and discharge helpers or employees was not prohibited to the defendant in this case. The contract was simply silent on this point. Here the defendant agreed that he would comply with the rules and regulations of the company as given to him from time to time, and from this it is argued that he was therefore subject to the control of the company, but in our opinion this provision in the contract does not refer to a control over the manner and method of conducting his operations but only refers to the ultimate result to be attained, and it is, therefore, within the principle announced in *Jones v. Standerfer,* 296 Ill. App. 145, 151, where the court said: ''We are of the opinion that the control reserved by the contract to the Oil Company is as to the ultimate results to be obtained in the sale of oil products and that it pertains to the contractual features rather than to a control over the details and physical movements necessary to accomplish the results sought in the sale of oil products. Control was reserved to fix the sale price, to extend credit, to require reports and inventories, but it did not undertake to control the hours of labor, the time to make collections, the persons to solicit for orders.''

Defendant insists that the facts in this case are substantially parallel with those in *Darner v. Colby,* 375 Ill. 558, where the person in question was held to be an employee and not an independent contractor. It appeared in that case that the defendant Colby was employed by an oil company as the local manager of its bulk station. While returning from Chicago Heights, Illinois, where he had gone with his truck to obtain

some petroleum products belonging to the oil company, he was involved in an accident which resulted in an action being instituted against him. There was a written contract between Colby and the oil company in that case. By this contract the oil company was required to pay certain miscellaneous expenses of Colby, a provision which is absent from the contract here in evidence. Also in the *Darner* case the company agreed in its contract to pay the employee for hauling its products in addition to paying him a commission on sales, a factor not present here, and the accident occurred while he was hauling the company's products. The company also placed the liability insurance on the truck. Colby had no authority under his contract to extend credit except when authorized by the company, while here extension of credit is left to the sole discretion of the defendant, a relationship inconsistent with that of an employer-employee. These factors distinguish the *Darner* case from the instant action.

While we recognize that there are certain elements present in this case indicating that the defendant was an employee of the company, we are of the opinion that there are more factors present here which indicate that he was an independent contractor and that the special finding of the jury is not contrary to the manifest weight of the evidence.

It is next insisted that the general verdict of the jury is contrary to the manifest weight of the evidence. The record discloses that Main Mitchell was an employee of the Lake County Highway Maintenance Department, and he testified that he was working with Carl Rasmussen, plaintiff's decedent, at the time of the accident and had been working with him for about a year; that Rasmussen was a prompt and conscientious worker, in good health, of good judgment and could see and hear well. He stated they were working on the shoulder of the highway in question at the time of the

192

accident; that the weather was clear and dry and visibility was good; that he and the decedent had just spread some gravel along the south edge of the highway and had parked the truck which they were using for this purpose on the south shoulder and off the blacktop portion of the highway except for the left-rear wheel. This gravel had been spread for a distance of some 80 to 100 feet along the edge of the highway. At the time of the accident he testified that he was standing about ten feet behind the truck and west of it levelling off rough spots in the gravel which they had spread, and the decedent was cleaning and sweeping approximately 80 feet behind him. No vehicles were coming from either way, and the road was clear. He did not hear the approach of the defendant's truck, and the first he knew of anything being wrong was when he heard a crash or impact. Just a second before the crash or impact, he testified that he had noticed the decedent standing on the shoulder of the highway near the south edge thereof pulling the gravel back off the highway with his sweeper's broom. After the truck hit the decedent, it continued on toward him, and he estimated that it was travelling upwards of fifty miles an hour. He dropped his shovel with which he was smoothing out the gravel and slid out of the path of the truck, which, he testified, was already off the road and onto the south shoulder. The defendant's truck continued on down the road and hit the truck which the witness and decedent had just unloaded and parked. This truck of the defendant was, at the time, so this witness testified, completely off the pavement and on the south shoulder. There was no evidence to contradict this witness's version of the accident.

Deputy Sheriff George Bock, Jr. testified that he was called to the scene of the accident and arrived there between 1:30 and 2:00 p. m. When he found out that the defendant's truck had been involved in the accident,

193

he went to his residence and found him in the front room of his home in a half-sitting position on the davenport. The defendant was having trouble breathing, and he detected alcohol fumes on his breath and gave it as his opinion that the defendant was intoxicated. He asked the defendant where he had been drinking and the defendant informed him at John & Joe's, and when he had asked him how much he had to drink, he said "Ask Joe Blaugh" or something similar to that. He took the defendant to a Dr. Goldy. He asked Dr. Goldy to draw blood from the defendant in order to determine its alcoholic content. The defendant gave Dr. Goldy permission to draw some blood, but the blood so drawn was afterwards thrown away without ever having been tested.

Dr. Goldy testified that he saw the defendant in his office on the day in question and that he was irrational, was rather loud and kept talking and raving around, that his speech was very incoherent, and that he noticed an odor on his breath which could have been alcohol or acetone.

Dr. Foley testified that he examined the defendant at the Lake County General Hospital on the day of the accident at about 5:00 o'clock. At that time the defendant was in a coma and did not have any realization that a doctor was examining him. He had a contusion and abrasion around the left eye, and there was an abrasion on one of his hands. The doctor made findings of his eyes, which were negative. There was no evidence of bleeding from the nose, mouth, or ears. His reflexes were negative, and there was no evidence that he could find of any severe brain injury, but he concluded that the defendant had had a moderate concussion because of the fact that he was then in a coma. Dr. Foley further stated that he noticed a faint odor of alcohol on defendant's breath when he examined him some four hours after the accident; that the defendant

194

was restless and jumpy for two days following the accident, after which he improved rapidly and was discharged on the sixth day following his admission to the hospital. The only treatment given to him was sedation and bed rest.

Emanuel Vincent testified that he was the manager of the Kuener Farm where the defendant had delivered an order of gasoline about half an hour before the accident. He stated that although he paid no particular attention to such matters, he did not notice any odor of alcohol on the defendant's breath, nor anything unusual about his speech.

 The defendant asserts that the foregoing evidence does not constitute a sufficient basis for the general finding of the jury against him. The plaintiff argues that such evidence conclusively shows that the defendant was guilty of the wilful and wanton misconduct charged against him. In *Schneiderman v. Interstate Transit Lines,* 394 Ill. 569, 583, wilful and wanton conduct is defined thus: ''A wilful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care. (*Brown v. Illinois Terminal Co.,* 319 Ill. 326; *Heidenreich v. Bremner,* 260 Ill. 439; *Illinois Central Railroad Co. v. Leiner,* 202 Ill. 624.) The question whether a personal injury has been inflicted by wilful or wanton conduct is a question of fact to be determined by the jury. *Bernier v. Illinois Central Railroad Co.,* 296 Ill. 464.''

 We cannot say, after a careful consideration of all of the evidence in the record, that the general verdict of the jury is contrary to the manifest weight

195

thereof. The factual situation here presents the case of a truck driver operating his truck in the daylight and with good visibility and without interference along a paved rural highway at an approximate rate of fifty miles an hour and driving it completely off of the highway and onto the shoulder of the road and running into a highway maintenance employee standing on the shoulder and engaged in levelling off gravel placed along the edge of the highway to cover a fill, and after striking the employee and a truck parked on the shoulder of the road continuing on to his own home without stopping. A jury might very well find that such conduct exhibits a reckless disregard of the rights and safety of others.

Counsel for defendant contend that the verdict is excessive, while counsel for the plaintiff insists that it is a very modest sum and far below the actual loss sustained by the plaintiff. Plaintiff's intestate was forty-one years of age at the time of the accident, and had lived with his mother, the plaintiff, all of his life except when he was in the army during World War II. Plaintiff was sixty-three years of age. She had remarried many years ago after the death of decedent's father. In addition to the decedent, plaintiff had three other children, two of whom were married and living away from home, and one, a son, Lloyd, age twenty-five, living at home. Plaintiff testified that her son Carl, the decedent, was a strong, healthy, able-bodied man, unmarried, of steady and sober habits, and a good worker; that he gave her twenty-five dollars a week out of his wages, and, in addition, paid for the electricity, gas, and fuel used in the operation of the household; that he washed the storm windows and the other windows, cut the lawn and bushes, and performed other duties about the home; and that he made a weekly salary of sixty-six dollars. To the twenty-five dollar weekly contribution which the dece-

196

dent made to his mother must be added the value of the utility bills which he paid and the value of the personal services which he rendered. The law recognizes these as elements of pecuniary loss. (*McFarlane v. Chicago City Ry. Co.*, 288 Ill. 476, 483.) According to the mortality tables introduced in evidence, plaintiff had a life expectancy of twelve years, and the jury was entitled to consider the pecuniary benefits which plaintiff might expect to receive from the decedent over the period of her life expectancy. At the time this accident occurred, our Legislature had fixed the maximum amount which could be awarded for wrongful death at $15,000, and this sum was by the last session of the Legislature increased to $20,000. In view of the weekly payments which decedent made to the plaintiff and of the various living expenses which he paid and the personal services which he rendered in and about the household and taking into consideration the deflated value of the dollar, we are unable to say that the verdict which the jury returned is excessive.

 As a final contention, the defendant argues that counsel for plaintiff was guilty of improper and prejudicial conduct in his final argument to the jury. The argument complained of is as follows: ". . . You add the two figures, 22 and 16, and you are up to $38,000 of loss. What about hospital bills, or doctor bills if a person is sick. She depended on this man, and at her age isn't that a reasonable thing that might occur. They say that the award by the jury shall be fair, reasonable and just but not over that amount. It is too bad our statute has that limit. Mr. Dalziel (Counsel for defendant): That is objected to, if the court please. The Court: Sustained. Mr. Davidson (Counsel for plaintiff): We should not penalize her because her loss is greater than that amount. That is why I say to you that an award of $15,000 is fair, and don't think you are going— Mr. Dalziel: I object,

if the court please. Mr. Davidson: It is simply the court's province, and I know you want to do the right thing in fixing her damages, and if you believe that $15,000 is fair, by all means give her that sum. . . ." Upon objection being made to the foregoing argument, the court asked the reporter to read it back and the reporter stated that he did not get it all. Counsel for defendant presented affidavits upon the motion for a new trial in which he asserted that what counsel for plaintiff actually said in this argument to the jury was this: "We should not penalize her because her loss is greater than that amount. That is why I say to you that an award of $15,000 is fair, and don't think you are going to get her paid any sooner by returning a verdict for a small amount." It is insisted that this statement by counsel for plaintiff was an attempt to tell the jury that the defendant was insured. Counsel for plaintiff denies that he made the quoted statement. When counsel for defendant objected to the plaintiff's argument, no ruling was made by the court on the objection, and it is, therefore, not properly preserved for review in this court. However, assuming that the foregoing remark was actually made and further assuming that it has been properly preserved for review here, we have reached the conclusion, in view of all of the facts and circumstances appearing in the record, that the remark was not sufficiently prejudicial to the defendant's rights to warrant a reversal of this judgment. We do not believe the remark warrants the construction which counsel places upon it.

The judgment of the circuit court of Lake county is affirmed.

*Judgment affirmed.*