Nicholas A. Karris, Plaintiff-Appellee, v. Woodstock, Inc., Defendant-Appellant.

(No. 58222;

First District (5th Division)—January 18, 1974.

*Supplemental opinion filed upon denial of rehearing May 17, 1974.*

2

Herbert I. Rothbart, of Getzoff, Rothbart & Getzoff, of Chicago, for appellant.

George B. Collins and Jeffrey Schulman, of Collins & Amos, of Chicago, for appellee.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Plaintiff brought suit for the return of a $50,000 deposit he had placed with defendant. Defendant answered claiming plaintiff had authorized several commodity transactions resulting in losses over and above the amount of the deposit and counterclaimed for $23,920, the amount of this excess loss. Although the complaint was for a declaratory judgment and other relief, the matter was transferred to the law calendar and tried without a jury. The court entered judgment in favor of plaintiff for $50,000 and costs and dismissed defendant's counterclaim.

Defendant contends: (1) the court erred in allowing an evidence deposition to be used at trial; (2) the court erred in not ruling on certain objections and made inconsistent rulings in the admission of evidence; and (3) that the judgment is against the manifest weight of the evidence. EVIDENCE

The testimony of Martin Scanlon, by deposition (objected to by defendant), was as follows: During the relevant period in issue, he was employed by the defendant as commodity broker and manager of defendant's office in Kansas City, Missouri. The deposition was taken December 22, 1970, at which time Scanlon was residing in Leawood,

Kansas. At the time of the deposition, Scanlon was unemployed. He had known plaintiff since 1958.

In December of 1969 plaintiff had an account with defendant. During this period plaintiff traded in February pork bellies. The trades turned out to be very profitable and plaintiff gave him roughly one-third of the profit or about $16,000. A Mr. Gene Shapiro had an equity interest in this trade with plaintiff but Scanlon denied having any equity in the trade himself nor was he to share in any portion of a loss, if there had been one. With regard to this trading he had been verbally authorized by plaintiff to execute this trade. Also, he thought he probably advised plaintiff, while the market was open, that orders had been filled for plaintiff's account.

On March 17, 1970, he had a phone conversation with plaintiff concerning commodities in which he suggested that plaintiff trade in pork belly futures. Thereafter, sometime between March 17 and 20, plaintiff deposited $50,000 with defendant. In making his recommendation to plaintiff he used as a factor for his opinion a government quarterly report. This report is made public after the market closes on the day of issuance and was to be released on March 20, 1970.

During the day of March 20 he had several telephone conversations with plaintiff. The first conversation occurred between 9:30 and 10:00 A.M. and concerned the general market conditions relative to pork bellies. During this conversation plaintiff asked to be kept posted on the market. In his next conversation with plaintiff he discussed the margin requirements for pork belly futures and told plaintiff that defendant would require $1000, rather than $700, as a margin for each contract. Plaintiff responded that he wanted to look around and see what margins were required from other commodity houses. After this conversation he also checked the margin requirements at other commodity houses.

From March 17 through and including March 20 plaintiff never specifically placed an order to purchase any commodity, nor was an order placed during any of these conversations. Nevertheless, some time around mid-morning on March 20, he placed orders for plaintiff's account. He felt that "we were in concert to get along on the market." "In concert" meant that he felt both he and plaintiff believed the market would go up. He also thought their thinking was the same with regard to the trading in March 1970 as it had been in December 1969. Although he thought his thinking was the same, plaintiff never told him that it was the same.

In placing the orders he called up defendant and told defendant's employees to buy $50,000 worth of July pork belly futures but did not give them an order to buy 75 contracts, which was the amount eventually purchased. He didn't specifically remember, but he thought defendant

would report the fills (executed orders) either to himself or his secretary from time to time during the day. As these reported fills were received, he did not communicate these to plaintiff. He did not speak with plaintiff at any time prior to the close of the market to report that orders had been filled for his account. He did think that other people in the office would have advised plaintiff of the filled orders.

After the market closed on March 20, and some time that evening, he had another phone conversation with plaintiff, which was rather heated, at which time he advised plaintiff of the filled orders. In this conversation plaintiff threatened to sue him and defendant. On the following day he had another phone conversation with plaintiff in which he told plaintiff, "that is the way it was. That is the ball game." On cross-examination it was brought out that one other customer disavowed a purchase of July pork bellies made by Scanlon on March 20, 1970.

*Testimony of plaintiff in his own behalf:*

On December 23, 1969, while the market was open, he authorized Scanlon by phone to execute trades for him. Later, and before the market had closed, Scanlon called him and advised him that his orders had been filled. The order in December 1969 was specific and was not discretionary. He had requested that Scanlon report fills to him and stated he would require this of anyone. He gave one-third of the profit on the December trade to Scanlon as a gratuity. As far as that trade was concerned, a verbal agreement did exist, in the nature of a three-way division of profits and losses, but only he and Gene Shapiro had made an equity investment in the trade. No similar agreement existed with regard to his March deposit of funds with either Scanlon or Shapiro. Defendant impeached plaintiff by introducing a Commodity Exchange Authority form entitled "Statement of Reporting Trader." In this form plaintiff had checked "no" when asked if other persons have any financial interest in his account, but where next to the question it states, "If yes, give name and address of such person(s)," he listed Scanlon and Shapiro.* Plaintiff claimed he filed the wrong document by mistake but has never called the Commodity Exchange Authority about the document.

On March 17, 1970, he delivered to defendant a certified check for $50,000. On this day he had a phone conversation with Scanlon about the

---

* Another question in this form asked if the individual was a member of a partnership dealing in commodity futures, which was answered "no." The form also asked if any other person controlled the trading in the account, which was likewise answered "no."

It was brought out later, in the testimony of Richard Becker, that this form had to be filed the same day or the next day after a trade is executed. This form was filed in February, at least a month prior to March 20.

general market conditions for pork belly futures. Scanlon felt the market was bullish, that it would probably go up. Between March 17 and 19 several other conversations occurred but only concerning "May pork bellies." It is a rule of the houses he has traded with that some money must be advanced before a customer can trade commodities.

Some time in late February or early March he also discussed trading in commodities with Leo Waxman, a friend and business associate. Waxman gave him $10,000 to open an account for him. Authority to execute this account had to come from Waxman although Waxman relied entirely upon him for his investment. No trading was done in this account. With regard to his own $50,000 deposit, no one else had an interest, neither Waxman, Shapiro nor Scanlon.

Right after the opening of the market on March 20, between 9:30 and 10:00 A.M., he called Richard Becker, a vice-president of defendant. He asked Becker's opinion of the market in May pork bellies. Becker was not in favor of a bullish or a long position and did not favor trading on the basis of an anticipated government crop report. He only had one conversation with Becker while the market was open. He also spoke with Scanlon early that morning and asked him about general market conditions. Scanlon said he was bullish, but there was a variety of opinions. In a later conversation with Scanlon he was informed that the margin requirement had been changed by defendant from $700 to $1000. He then told Scanlon that he was disturbed by this change and wanted to call around. He later spoke with Scanlon and told him to do nothing until he called back. On March 20 he never placed an order for pork bellies.

After the market closed and while calling the Kansas City office to arrange a refund of his money, he was first advised that orders had been entered for his account. When he learned his account was charged with these orders, he made a demand for refund of his money. He first called Richard Becker to demand a refund of his money but was refused. He then sent a telegram to defendant in Chicago, time stamped 4:00 P.M., reciting that defendant had no authority to execute any order and again demanding a refund of his money.

In the early evening of March 20 he spoke with Scanlon and again demanded his money back. Plaintiff was asked on cross-examination whether Scanlon had given a reason for not refunding the money and stated he didn't remember. He was impeached by prior deposition testimony wherein he had stated, "He [Scanlon] refused to refund the money. His position at that time was that I had made these orders."

Scanlon could only deal with specific orders as to price and quantity and commodity. Scanlon never had any discretionary authority.

It was brought out on cross-examination that plaintiff spoke with Scanlon a few weeks prior to the trial and that they were friends.

*Testimony of Leo Waxman, for plaintiff:*

He had discussed trading in commodity futures with plaintiff and decided to join with him in trading. On March 19 he gave plaintiff a check for $10,000. On March 20 he had several conversations with plaintiff. In the first conversation, occurring probably before 9:00 A.M., plaintiff told him that this was the day they would either trade or not. Around noon he had another conversation with plaintiff who told him "Forget it, we are not doing anything today, do what you want to do, go on about your business." Later in the day he had a third conversation with plaintiff. He was then told, "You had better call the broker and find out if they have used your money. They have used mine, and I gave them no authority to do it. See if your money is there. I am going to have troubles. See if you will have some troubles."

On cross-examination it was brought out that he and plaintiff are friends and have had a variety of social and business dealings. His funds were not used for the purchase of commodities and he subsequently got his money back.

*Testimony of Gene Shapiro, for plaintiff:*

In December 1969 he had been involved in a commodities futures transaction with plaintiff and Scanlon. The defendant had been the brokerage house involved. He had put up $22,500 of the total $45,000 deposit that had been made. Plaintiff in a conversation in March had asked him if he would be interested in a similar situation to December, which he turned down. During a conversation with plaintiff on March 20 plaintiff told him he wasn't going to trade. On March 20 he did not participate in any commodities transaction with plaintiff.

*Testimony of Walter Kowalski, head statistician at the Chicago Mercantile Exchange, for defendant:*

The government pig report is released from his office at 2:00 P.M. Chicago time and is available to the public around 2:15 P.M. These reports can have a bearish or bullish effect on the market.

*Testimony of Peter Stavros, supervisor of all defendant's activities on the floor of the Mercantile Exchange, for defendant:*

He was under instructions to keep his employers informed at all times of what customers are trading, what their positions are and what they wish to do in the market at all times. Scanlon would place orders with him for Scanlon's customers. He never talked personally with plaintiff. On December 23, 1969, he put in orders for plaintiff and reported back to Scanlon.

On March 20, 1970, orders were placed for plaintiff between 11:30

and 12:30. After filing each of these orders, he would report to Scanlon. He would also immediately report the fills to either Richard or Sidney Becker. Subsequently he sold the 75 cars for the account of plaintiff, pursuant to Scanlon's instructions. He does not receive orders from customers directly; rather, he receives them from salesmen or branch managers. On March 20 he reported to Scanlon that the orders were placed. *Testimony of Richard Becker, defendant's vice-president who administrates the functions of the company, for defendant:*

Plaintiff had a nondiscretionary account with defendant. All orders were entered verbally. In December he told plaintiff to put all his orders through Scanlon.

On December 23, 1969, plaintiff bought around 70 cars. Every time an order was executed, Stavros would call him. During that day plaintiff had called and asked him his opinion of the market and also acknowledged the purchases he had made.

Around March 17, 1970, he had another conversation with plaintiff. Plaintiff told him another report was coming out and asked his opinion of the market. After he had a phone conversation with Scanlon about plaintiff, and at 10:00 A.M. on March 20, plaintiff again called him. Plaintiff told him, "Dick, the same situation has come up, why don't you take a fly yourself?" Plaintiff also said, "Go ahead, will buy them the same way, a few at a time, and I will be in touch with you.." Plaintiff also mentioned Waxman's account. No trades were made for Waxman and his money was subsequently returned.

After the ten o'clock conversation, plaintiff called several more times during the trading day. In these conversations plaintiff wanted to know at approximately what time the orders were being given, what he was buying and where the market was at each point. In a noon conversation plaintiff wanted to know exactly how many cars he had bought and what the prices were.

The next conversation occurred around 1:00 P.M., just after the market closed. Plaintiff told him he had bought 70 or 75 cars and wanted to know the closing price. After the government pig report was issued and around 3:00 P.M., he had another conversation with plaintiff. In this phone call plaintiff said, "Dick, it looks like I am in trouble. The market is going to break wide open. I don't want those trades." At about 4:00 or 4:30 he received a telegram from plaintiff. Defendant did not participate in any equity position in these trades.

Subsequent to March 23, 1970, a margin call was issued. Thereafter, since plaintiff did not come up with additional money, defendant had to sell out plaintiff's account. In connection with the March 1970 trading, defendant had to pay $23,920 to the Mercantile Exchange.

On cross-examination he stated that in his last conversation with plaintiff on March 20, 1970, plaintiff did not say that he didn't authorize the trades. He was impeached by his prior deposition testimony wherein he stated that plaintiff told him he hadn't authorized the trades. He was also impeached as to his recitation of conversations with plaintiff during the trading day. In a prior deposition he was asked, "Did you have any conversations with Karris while they were trading?" and responded "no" to this question.

Plaintiff finally testified in rebuttal: After his first early morning conversation with Richard Becker on March 20, he had no further conversations with him while the market was open. In a subsequent conversation after the market had closed, he told Becker he had not placed any order and demanded a refund of his money.

OPINION

Defendant contends that the court erred in permitting Scanlon's evidence deposition to be used at trial without a prior showing by plaintiff of reasonable diligence to obtain the attendance at trial of Scanlon and because it appeared that Scanlon's absence was procured by plaintiff. The use of an evidence deposition at trial is governed by Supreme Court Rule 212 (Ill. Rev. Stat. 1967, ch. 110A, par. 212). In pertinent part the rule provides:

> "(b) USE OF EVIDENCE DEPOSITIONS. All or any part of an evidence deposition may be used for any purpose for which a discovery deposition may be used, and may be used by any party for any purpose if the court finds that at the time of the trial: * * *
>
> (2) the deponent is out of the county unless it appears that the absence was procured by the party offering the deposition, * * *"

Defendant points out that Scanlon and plaintiff had prior financial dealings together, that Scanlon was unemployed and that shortly before trial Scanlon had talked by phone with plaintiff while the former was in Chicago. Defendant argues that because of "bias, prejudice, financial interest, social interest and outright fear" that existed between plaintiff and Scanlon, not only could the attendance of Scanlon at the time of trial have been procured through reasonable diligence, but that Scanlon's absence was obviously dictated by plaintiff.

In urging that plaintiff had to show reasonable diligence, defendant relies on *John v. Tribune Co.*, 28 Ill.App.2d 300, 171 N.E.2d 432, reversed on other grounds, 24 Ill.2d 437, 181 N.E.2d 105. In *John*, when the evidence deposition of a witness was offered, the court stated that although there was a reference to the witness as presently living out of the state,

the party offering the deposition had not shown reasonable diligence in trying to obtain the presence of the witness. The key fact which distinguishes the instant cause is that Scanlon both at the time of the taking of the evidence deposition and at trial, was not a resident of this state but lived in Leawood, Kansas; whereas in *John* the deponent was a resident of Illinois at the time of the deposition and was shown to be out of state only at the time of trial. *Powers v. Kelley,* 83 Ill.App.2d 289, 227 N.E.2d 376, seems to be directly in point. There plaintiff sued under the Dram Shop Act for personal injuries when he was shot in a tavern. Over objection plaintiff introduced an evidence deposition of one of the men who shot him; the deposition had been taken outside Illinois in St. Louis, Missouri. The court stated the relevant law at 296-297:

"As is pointed out in the Historical and Practice Notes following Rule 19—10 in the Illinois Annotated Statutes, subsection (3) of the rule altered the prior rule, to now provide that the test of the deponent's status is applied at the time of trial. Here the court was advised by statement of counsel, and it was shown by the deposition itself, that the deponent resided in St. Louis, Missouri, on the date it was taken, October 29, 1965, almost six months before the trial. The presumption of continuation of residence is well known in the law—residence once established is presumed to continue until the contrary is shown. In re McCalmont, 16 Ill.App. 2d 246, 148 N.E.2d 23; People v. Estate of Robert Moir, 207 Ill. 180, 69 N.E. 905; In re Estate of Dedmore, 257 Ill.App. 519; in each of these cases the court held that there is a presumption of continued residence, and the burden of proof to show a change of residence is upon the party asserting such change. The showing of residence of the deponent outside St. Clair County, and in fact outside the State, raised the presumption of continuance of residence in Missouri, and as a resident of Missouri the deponent was not amendable to subpoena. C 110, § 62, Ill. Rev. Stat., 1963."

The *Powers* court then went on to distinguish *John,* stating at page 298:

"In the present case, no such showing [of reasonable diligence] was necessary in view of the presumption of continued residence in Missouri, and deponent's not being amenable to summons. Had there been a showing that deponent had resided in St. Clair County in the present case, it would have become incumbent upon plaintiff to have made a showing, upon which the court could have based a finding; but with the presumption of continued residence in Missouri and appellants' failure to overcome the presumption, we cannot say that the court abused its discretion in admitting the deposition."

■■ Nor was there probative evidence presented in the instant case to demonstrate that plaintiff procured the absence of Scanlon. Although defendant has made allegations to this effect, he has only shown that Scanlon may have been biased in favor of plaintiff. This alone will not serve to demonstrate that plaintiff procured the absence of Scanlon. Therefore, we find that the court did not err in admitting the evidence deposition at trial.

Defendant next argues that the trial court committed prejudicial and substantial error in not ruling on certain objections and by making inconsistent rulings in the admission of evidence. Defendant points to three specific instances to justify this contention: (1) the court never ruled on objections contained in Scanlon's evidence deposition; (2) the court excluded certain hearsay testimony; and (3) the court precluded Richard Becker from testifying as to conversations with plaintiff on March 20. Although defendant cites these rulings or lack thereof to support his contention of prejudicial error, he has not cited any cases nor attempted to show how each individual ruling was erroneous. Nevertheless, we will review each claim.

While Scanlon's evidence deposition was being taken, defendant objected to the form of many of the questions as being leading questions. At trial, when the deposition was being read into the record, defendant again objected. The court reserved ruling on these objections until after he had heard the entire deposition. The defendant never renewed his objections nor did the court make any ruling.

■■■ In *Cusanelli v. Steele*, 287 Ill.App. 490, 5 N.E.2d 296, the court gave an excellent description of the law in this area when it stated at page 495:

"The record does not show that the court made any ruling thereon, hence there is nothing for the consideration of this court relative to the offer of such evidence. *Where a ruling on objections to evidence is reserved, and not afterwards made, there is no ruling for consideration on review. Mitchell v. Chicago, B. & Q. Ry. Co.*, 265 Ill. 300.

To avail of an objection, counsel must insist upon a ruling of the trial court upon the objection, and must either obtain a ruling or a refusal of the court to rule. Mere failure to rule is not sufficient, *City of Salem v. Webster*, 192 Ill. 369; *Summerville v. Penn Drilling Co.*, 119 Ill.App. 152; *Chicago & E. I. R. Co. v. Heilingstein*, 137 Ill.App. 35. The law upon this question is stated in 3 Corpus Juris, p. 889, sec. 795: 'As a general rule, error alleged in the admission or rejection of evidence, cannot be considered by the

reviewing court if it does not appear from the record that there. was a ruling relating thereto.'

Here the record fails to disclose a ruling upon the objection to the offer of the exhibits, and further does not show that defendant insisted upon such ruling, or that the court refused to make same; hence, within the rule of the authorities cited, there is nothing for the consideration of the court upon the proposition." (Emphasis supplied.)

(See *Jones v. Lukas,* 122 Ill.App.2d 162, 258 N.E.2d 147; *Rasmussen v. Clark,* 346 Ill.App. 181, 104 N.E.2d 325.) In accordance with the authorities above cited, we find that any alleged error was waived.

Defendant has pointed to numerous instances where the court sustained plaintiff's objection to testimony of conversations between defendant's employees as being hearsay. We have reviewed the relevant portions of the record and find these conversations were hearsay and that the court's rulings were proper.

Defendant argues that the defense witness, Richard Becker, was precluded from testifying as to conversations with plaintiff on March 20. The court sustained plaintiff's objections to defendant's questions on this subject as being repetitious. "Where a witness has already testified fully as to the facts involved, it is not improper for the court to restrict repetitious interrogation. *People v. McCain,* 29 Ill.2d 132." (*People v. Davis,* 35 Ill.2d 55, 62, 219 N.E.2d 468; *Chism v. Decatur Newspapers, Inc.,* 340 Ill.App. 42, 91 N.E.2d 114.) Contrary to defendant's above assertion, Richard Becker was allowed to fully recite the substance of these conversations. It was only when the questions were repetitive that the court sustained plaintiff's objections, and at those times the court in commenting on its rulings stated in detail the witness' prior testimony as to these conversations. The court acted within its discretion, and we find no error in these rulings.

Finally, defendant argues that the judgment was against the manifest weight of the evidence. He urges this court to review the record without giving any weight to what the trial court may have found regarding Scanlon's deposition, since the court could not view the demeanor of that witness. We agree that insofar as this deposition is concerned, we are in equally as good a position as the trial court to weigh the evidence. But the trial court was in a superior position to observe the demeanor and the credibility of the many other witnesses who testified, including the plaintiff and the two major officers of the defendant. While a trial court's finding is always subject to review, it will not be disturbed unless manifestly against the weight of the evidence. In such case

an opposite conclusion must be clearly evident. *Comm v. Goodman*, 6 Ill.App.3d 847, 286 N.E.2d 758.

The court had before it the testimony of plaintiff and Scanlon denying that plaintiff authorized any trades. The court also heard the corroboative testimony of Waxman and Shapiro that plaintiff did not trade on March 20 and evidence that at least one other customer of Scanlon disavowed a trade Scanlon made for him on that day. Although defendant's witnesses directly contradicted plaintiff's position, the court could have felt that this testimony was at least partially impeached when Richard Becker stated that during the day of March 20 he had several conversations with plaintiff wherein he confirmed the orders, whereas Becker, in a prior deposition, had stated that he had no conversations with plaintiff while they were trading.

From a review of the record we cannot say that an opposite conclusion is clearly evident.

The judgment is affirmed.

Affirmed.

ENGLISH and LORENZ, JJ., concur.

### SUPPLEMENTAL OPINION ON DENIAL OF PETITION FOR REHEARING.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

On January 18, 1974, this court issued its opinion affirming a judgment of the circuit court in favor of plaintiff for the return of plaintiff's $50,000 deposit. Defendant had withheld these funds because of losses sustained as a result of certain commodities transactions which defendant claimed plaintiff authorized. Implicit in our opinion was the conclusion that Martin Scanlon, who admitted making the purchases of commodity futures, was defendant's agent and not the agent of plaintiff. In the instant petition defendant asserts that this court misapprehended the state of the record when it found that the trial court's determination of agency was not against the manifest weight of the evidence.* More specifically, defendant contends that Scanlon, in placing the March 20th trades, (1) was acting as plaintiff's agent and not defendant's agent, and (2) if he was defendant's agent, he was acting outside the scope of his employment. To support this contention defendant relies on the

---

* In the original briefs filed with this court the issue of agency was raised only collaterally. Defendant alleged that Scanlon and plaintiff were acting in concert and so plaintiff should have been bound by Scanlon's actions. No case authority was originally cited to support the contention that Scanlon was plaintiff's agent.

facts that Scanlon received no salary from defendant and that plaintiff controlled Scanlon's actions.

■■ We have reviewed the record and find that the evidence overwhelmingly refutes defendant's instant arguments. There is evidence to demonstrate that for a period of time, including the relevant dates in question, Scanlon was employed by defendant as a broker and manager of its Kansas City office. It is true, as defendant avers, that Scanlon did not receive a salary until April or May. However, he was being paid by defendant for soliciting business.

Defendant asserts that Scanlon was controlled by plaintiff. It must be noted that plaintiff had a non-discretionary account with defendant. Defendant could not act without specific orders as to price, quantity and commodity. Defendant, in its opening statement to the court, characterized its business as accepting and executing orders to buy or sell. Therefore, in carrying out defendant's activities, Scanlon was limited to executing specific buy and sell orders from plaintiff. This evidence concerning the control plaintiff had over Scanlon is not indicative of an agency relationship. It was actually defendant who exercised control over Scanlon, for the evidence demonstrated that Scanlon was limited by defendant's margin requirements which were communicated to him.

The proof presented other factors which refute defendant's contentions: No evidence was introduced that Scanlon executed orders through any other clearing members, besides defendant; Richard Becker, defendant's vice-president, initially told plaintiff to put all orders through Scanlon; Becker stated that any refunds must be made directly to plaintiff and could not be given to Scanlon; and with regard to the alleged transaction in March, Scanlon was the person who initiated the first conversation with plaintiff, rather than plaintiff coming to Scanlon.

Defendant asserts that Scanlon looked to plaintiff for compensation and that he was only furthering his own interest, thus acting outside the scope of his employment. It bases this argument on the fact that in a prior trade (December) Scanlon received a gratuity from plaintiff. We have already noted that defendant paid Scanlon for soliciting customers. There was no evidence in the record to show that there was any agreement that plaintiff would compensate Scanlon for the alleged March trading. The most that can be said was that if plaintiff made a profit, he might have rewarded Scanlon with a gratuity. Also, any orders executed would directly benefit defendant's interests. The executing of orders was defendant's basic function. Defendant presented proof that a commission charge of $2700 would be due from the alleged transaction. This demonstrates that Scanlon was directly advancing defendant's interests.

Finally, we take note of the following colloquy occurring between plaintiff's counsel, defendant's counsel and the court:

"MR. COLLINS [plaintiff's counsel]: The broker calls in the order on behalf of his own company. Scanlon, by statute, is the agent of Woodstock.

THE COURT: That is my understanding.

MR. COLLINS: And when Scanlon called Stavros who is also a Woodstock agent, that is two agents of the same principal talking to each other, and that conversation goes back and forth, which is self-serving, within the purview of his client's business and not within the purview of my client.

MR. ROTHBART [defendant's counsel]: We are not denying that."

We have reviewed the cases cited by defendant and find them to be distinguishable on their facts. There was sufficient evidence in the record to support the finding that Scanlon was not plaintiff's agent. The petition for rehearing is denied.

Petition for rehearing denied.

SULLIVAN, P. J., and LORENZ, J., concur.