JIM D. KEEHNER, Plaintiff-Appellant, *v.* A. E. STALEY MANUFACTURING COMPANY, Defendant-Appellee.—(FRED H. CASH, Appellee.)

Fifth District   No. 76-439

Opinion filed July 6, 1977.

Jim D. Keehner, Ltd., of Belleville, for appellant.

Walker & Williams, of Belleville (David B. Stutsman, of counsel), for appellee A. E. Staley Manufacturing Company.

Mitchem, Tepper & Gwinn, of Urbana (John Gwinn, of counsel), for appellee Fred H. Cash.

Mr. JUSTICE JONES delivered the opinion of the court:

Plaintiff, Jim E. Keehner, brought suit against A. E. Staley Manufacturing Company, defendant, contending that losses he suffered in the commodity futures market were due to unauthorized transactions by Staley's agent, Fred H. Cash. Staley counterclaimed for the amount of the debit balance due after Keehner's account was closed out following his refusal to meet margin calls. Trial was had to the court sitting without a jury. Judgment was entered in favor of Staley on plaintiff's complaint and on its counterclaim.

We will deal initially with plaintiff's allegation of procedural errors. Specifically, plaintiff attacks the granting of defendant's motion for a change of venue from all judges of the Twentieth Judicial Circuit and alleges prejudice on the part of the trial court against him.

■■ Plaintiff attacks the motion as not containing specific allegations of prejudice and as being granted after a ruling on a substantive matter. It is a correct statement of the law that a motion for change of venue, when directed at several judges, should contain specific allegations of prejudice. (*Rosewood Corp. v. Transamerica Insurance Co.*, 57 Ill. 2d 247, 311 N.E.2d 673.) However, we consider the allegations contained in the motion to be sufficiently specific to meet this requirement. The motion alleges that the plaintiff had appeared before the judges of the twentieth circuit for approximately 15 years as a practicing attorney and the possibility of prejudice in his favor on the part of the judges when he appeared before them as a party litigant might prevent the defendant Staley from receiving a fair trial. It was further alleged that a judge of the circuit had ordered the deposition of a witness for Staley to be taken, not in Chicago, the place of the witness' residence and the usual choice of a place to take a deposition, but in St. Clair County, the place of residence of the plaintiff. This instance was offered as an example of special consideration already extended to Keehner.

■■■ It is also correct that a motion for change of venue should not be granted if the court has already ruled on a substantive matter. (*Frede v. McDaniels*, 37 Ill. App. 3d 1053, 347 N.E.2d 259; Ill. Rev. Stat. 1975, ch. 146, par. 3.) In this instance the court had already denied plaintiff's motion for summary judgment. It was therefore error to grant the motion. However, we have been cited to no cases nor are we able to find any where the granting, as opposed to the denial, of a motion for change of

venue has been the grounds for a reversal, especially where there is no showing of prejudice to the nonmoving party by reason of the granting of the motion. Here plaintiff merely alleges that he was "exposed to trial" before a judge not of his choosing. A great many litigants could say the same. We are of the opinion that the error was harmless. The record of the actions of the trial court need not be free of any error. (*Tarala v. Village of Wheeling*, 25 Ill. App. 3d 349, 323 N.E.2d 454.) The error complained of must have affected the outcome of the trial to constitute grounds for reversal. (*Phillips v. Shell Oil Co.*, 13 Ill. App. 3d 512, 300 N.E.2d 771.) In the instant case there has been no showing of prejudice to the plaintiff affecting the outcome of the trial or that prejudice arose simply because the trial was heard by a judge from a circuit other than the twentieth.

■■ Next plaintiff contends that the actions and remarks of the court during the conduct of the trial evidence that the court was prejudiced against him. Suffice it to say that we have examined the record in its entirety and neither the remarks and actions of which plaintiff complains nor any others establish prejudice on the part of the trial court. Plaintiff then alleges that the fact of social contact between the judge and representatives of the defendant while the trial was in progress reveals prejudice on the part of the court. Specifically, he alleges that the trial judge and both attorneys for Staley, the wife of one of the attorneys, and a witness for Staley had breakfast together on the morning of the second and last day of trial. Regardless of what our reaction might be if such an incident were shown by the record a mere allegation contained in a brief is not sufficient to bring such a matter to the attention of a reviewing court. It is so obvious as to require no citation of authority that a reviewing court may not take notice of matters *dehors* the record. This matter is certainly one which falls within that category.

Plaintiff next alleges that the judgment was contrary to the manifest weight of the evidence and contrary to law. A recital of the facts out of which the dispute arose is therefore necessary.

Plaintiff is an attorney practicing in Belleville, Illinois, in the Twentieth Judicial Circuit. On April 15, 1974, Keehner opened a commodity futures trading account with Fred H. Cash, a commodities broker in Champaign, Illinois. Cash was doing business as Fred H. Cash and Company, placing commodity orders through A. E. Staley Manufacturing Co. The complaint alleged that Cash was an agent of Staley, and the same was admitted by Staley in its answer. On the "Commodity Customer Confidential Account Information" sheet which Keehner filled out he indicated his net worth at $120,000 and his net liquid worth at $15,000. He also filled out a "signature card" which bore the following language:

"I hearby agree that all transactions executed for my account are

subject to the rules and customs of the Exchange (and its Clearing House, if any) where executed. I further agree that I will at all times without notice or demand from you maintain and keep my account fully margined and protected, in accordance with your requirements and that you will be kept secure by me against fluctuations of the market price of the commodities in my account. In case of my failure to maintain with you at all times such margin as you may deem adequate for your protection, you may, without prior demand or notice to me, sell and or purchase such commodities as you may consider necessary to fully protect my account."

Keehner was also given a 40-page pamphlet entitled "Understanding the Commodity Futures Market."

Plaintiff placed $500 with Cash the day the account was opened. He testified he told Cash that day that he could not afford to involve more than $3,000 to $5,000 in the market. Cash's testimony was that Keehner might have said this but that he (Cash) never guaranteed to Keehner that he could limit losses in this way. Cash transacted commodity trades for plaintiff's account for the next three months. Cash testified that around June 15 plaintiff called him wanting "more action" in the account. Plaintiff denied this. Over this period of time plaintiff met several margin calls, all for relatively small amounts, the largest being for $800. As of July 24, 1974, plaintiff's original $500 plus margin calls totaled $2,600. His account showed total profits as of that date of $26,000. On July 15 Cash persuaded Keehner to purchase and take delivery of a bar of platinum for $ 8,813. Plaintiff testified that he told Cash not to speculate with the platinum as he intended to keep it for at least a year. He also testified that he told Cash at this time to use only the profits in the account and not to involve the $2,600 he had actually paid in to date. Cash disputed this testimony.

On July 21 and 22, plaintiff received margin calls for $2,800 and $3,625 which were dated July 18 and 19. Plaintiff testified that he contacted Cash about these calls since they were for considerably more than any previous margin calls and was told he would not have to meet them, that the market would soon "straighten itself out." Cash testified that it was not necessary to meet these calls as there was money available upon liquidation of certain commodities in the account to supply sufficient margin.

On July 25, plaintiff received a telegram from Staley indicating that he had one-half hour to wire $14,000 to Staley in order to keep the account margined. This call was met by selling the platinum for $10,000 and an additional deposit by plaintiff of $4,000. There is a dispute in the evidence as to whether the platinum bar was sold as a result of an agreement between plaintiff and Cash or whether plaintiff was informed after the

fact. It is undisputed that plaintiff gave Cash a check for an additional $4,000.

Plaintiff testified that he told Cash at this time that he (Cash) had violated his orders not to involve him in transactions with a possibility of loss above $5,000, that Cash should admit this to Staley and tell them not to issue any more margin calls and not to close his account. The market trend which caused the large margin calls continued. Staley issued more margin calls which plaintiff did not meet and Staley liquidated his account with a final deficit of $9,298.

Shortly after receiving notification from Staley of the deficit balance plaintiff arranged to tape, without Cash's knowledge, phone calls he made to Cash concerning this entire series of transactions. These tapes were admitted into evidence at trial without objection from opposing counsel. Plaintiff filed suit against Staley on September 4, 1974, and acted as his own counsel throughout the trial and on appeal.

In alleging that the judgment was against the manifest weight of the evidence and contrary to law plaintiff repeats the arguments he offered at trial. He argues that Cash, as defendant Staley's agent, conducted unauthorized transactions in three particulars.

It becomes clear after studying the brief that plaintiff is not alleging unauthorized transactions in the usual sense of that term. That is, he is not alleging that the transactions were unauthorized because Cash did not check with him before placing orders to buy or sell. Rather, plaintiff is alleging that Cash involved him more deeply in the market than he wished to be involved. Plaintiff testified that he told Cash on the day he opened the account that he could not afford to lose more than $3,000 to $5,000 in the market. Cash testified that while plaintiff might have said such a thing to him that he (Cash) did not guarantee nor could he have guaranteed to plaintiff that it would be possible to so limit his possibility of loss.

■■ In the absence of uncontroverted proof that Cash did represent to plaintiff that he could limit his losses to an approximate amount, we consider the dispositive question to be whether plaintiff would have been justified in believing it was possible to limit his losses in this way. We have concluded that he would not have been justified in such a belief. The 40-page pamphlet which plaintiff testified he was given on the day he opened the account, entitled, "Understanding the Commodity Futures Market," states, if not explicitly then by clear implication, that the operation of the market is such that it is possible, and indeed to be expected at sometime during the existence of an account, to lose more than the amount of money one has paid in as "margin money." The concept of buying "on margin" and the allure of the commodities market is precisely the possibility of very large gains, with the corresponding possibility of losses

of the same magnitude, by the investment of a small cash outlay. The pamphlet makes this fact quite clear. It speaks of the possibility of the market moving adversely to a customer's position; the possibility of being "locked in" a position sustaining large losses and not being able to get out because the market is moving either up or down so rapidly that the daily limits set by the exchanges are exceeded by the first transaction to take place on a trading day and the market is then closed. In such a situation where the market is moving so rapidly in either direction there may be thousands of transactions backed up which cannot be closed because only a few or perhaps only one transaction can take place on a given day before the daily limit on price fluctuations is reached and the rules of the Exchange require that trading be closed.

This is what happened to Keehner's account. He had sold "short" on several commodities, meaning that he had sold contracts to deliver certain commodities at a specified time in the future, for a specified price per unit. This means that in order to "cover" his contracts he would have to purchase a contract to deliver at some point before the specified delivery date. If he had been able to purchase the cover contracts for a lower price per unit than he had been paid he would have made a profit on the transaction when he "closed it out" by purchasing the cover contract. However, the market price went up and he had to close out his contract by purchasing at a higher price per unit than he had been paid and he took a loss on the transactions. As the market price rose the possibility of loss rose correspondingly, causing the margin money on deposit to, in effect, shrink. That is, the amount on deposit no longer constituted the 10% or 20% of involvement required by the exchange, so more margin money was requested. The market price of the commodities which had been sold "short" went up rapidly—so rapidly that even though attempts were being made to close his position by purchasing a contract, and thus limit losses, the limit set by the exchange on permitted price fluctuations was reached during the first few transactions concluded for several days in a row. In addition the market was rising so rapidly that no one would sell out of fear of putting themselves in the same position that plaintiff was in. It was this phenomena, described in the pamphlet, which caused the large margin calls by Staley, not, as plaintiff implies, extraordinarily large transactions placed by Cash.

Plaintiff testified that he had read the pamphlet and "attempted" to understand it, thereby implying that he could not. We consider such an assertion by plaintiff to be unwarranted under the circumstances. He is a college graduate, a law school graduate, and a practicing attorney. The information contained in the pamphlet was certainly not beyond his capabilities.

■■ Even if it were the case that the information in the pamphlet were incomprehensible, the language on the signature card with Keehner signed—"I hereby agree that all transactions executed for my account are subject to the rules and customs of the Exchange (and its Clearing House, if any) where executed * * *"—should have been sufficient to alert him to the fact that he was not solely in the hands of Cash but was subject to other authority in the form of rules and regulations with which he *should* have familiarized himself even if he did not. This fact provides the answer to plaintiff's argument that Staley did not have to close out his account when they did but could instead have waited until the market was in such a condition that he would not have sustained losses. It is true that had plaintiff met the margin calls and his account remained open that he could have taken advantage of the subsequent fall in market prices and rather than sustaining losses would have made a profit. However, Staley could not, by the rules of the Chicago Board of Trade and the other exchanges as well, continue to transact business for an account that was not properly margined. Plaintiff, by signing the agreement, had subjected himself to the same requirements. *Thomson v. Thomson*, 315 Ill. 521, 146 N.E. 451.

■■ The second argument plaintiff makes concerning unauthorized transactions is that Cash lost the bar of platinum and plaintiff's "original investment" of $2,600 after receiving instructions that these items were to be "kept safe." Once again, the evidence is in dispute as to whether such instructions were ever given. However, it is not disputed that Cash asked plaintiff if he wished to remove both the platinum and the "original investment" from the account and plaintiff decided not to do so. Having made the decision to leave the "original investment" and the warehouse receipt for the platinum on deposit, we think it should have been obvious to plaintiff that both by the terms of the "signature card" that he signed and by the information contained in the pamphlet on market operations that these sums would then be available to meet any margin requirements should the market move adversely to his position. Once having made that decision he cannot now be heard to complain that it was the wrong one.

Keehner's third contention is that Cash placed unauthorized transactions resulting in a loss to him because Cash continued to trade after the $14,000 margin call was met, that is after plaintiff had instructed Cash to place no more transactions. However, after examining the record of transactions placed in evidence by Staley, a copy of which was sent to plaintiff shortly after each transaction took place, it is evident that the transactions which necessitated the margin calls and caused Staley to close out the account when the calls were not met were ones which had been initiated before those instructions were alleged to have been given.

Plaintiff relies on the case of *Karris v. Woodstock, Inc.*, 19 Ill. App. 3d 1, 312 N.E.2d 426, as authority for the proposition that unauthorized transactions by a broker should result in a return of the customer's margin and a rescission of losses and commissions. However, there are significant differences between the situation in the *Karris* case and the instant situation. In *Karris* the customer alleged that the broker placed a very large transaction with resulting large losses without first checking with the customer, contrary to the way in which all of their business had been conducted in the past. The customer was a man with an established expertise in the market who had always kept full control of all transactions placed for his account in the past. This is in sharp contrast to plaintiff, whose case is in large measure based upon his ignorance of market operations and whose instructions were limited to those concerned with what degree of loss he would accept. Also, a most important difference, the broker in *Karris* admitted that he had always cleared transactions with the customer before but failed to do so in this instance. Cash, on the other hand, denies that he ever received such instructions let alone directly violated them.

■■ Plaintiff attempts to cure this deficiency by alleging that Cash admitted he had violated plaintiff's instructions by remarks made during the taped phone calls. He quotes such language as "I got out of step that one damn day," "I am the fellow you have to jump on for that," "I am the person you have to raise hell with." We have reviewed the tapes, and we agree with the defendant Staley that these remarks and others of similar import, when heard in context, simply indicate that Cash is confessing to bad judgment not to having violated any instructions. Plaintiff relies especially on the language "I got out of step that one damn day." This remark, when taken in context, plainly means that Cash got out of step with the market "that one damn day," not that he "got out of step" with plaintiff's instructions. We do not disagree with the reasoning or result of *Karris*; we are simply of the opinion that it does not apply to the factual situation at hand.

■■ Plaintiff's final contention concerns his motion to amend the complaint to add Fred Cash as a party defendant. Plaintiff filed his motion more than two months after final judgment, and it was allowed. Cash then made a special and limited appearance to contest jurisdiction, and the order was entered dismissing Cash from the case. Plaintiff argues that this was error, relying on section 26 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 26):

"No action shall be dismissed for misjoinder of parties, or dismissed for nonjoinder of necessary parties without first affording reasonable opportunity to add them as parties. New

parties may be added and parties misjoined may be dropped by order of the court, at any stage of the cause, before or after judgment, as the ends of justice may require and on terms which the court may fix."

This rule has been interpreted by the case of *Zieler v. Village of Oak Lawn*, 23 Ill. App. 3d 752, 320 N.E.2d 86, as extending to necessary parties only. The further requirements enunciated in that case are that the judgment in the original action is not satisfied and that such parties must have been necessary parties to the original action with a direct interest in the subject matter of the lawsuit. The proper test for determining if a party is a necessary party has been variously stated. There are two recent formulations which we believe correctly state the test. "If the interest of an absent party in the matter in controversy is such that no judgment could be entered which would do justice between the parties actually before the court without injuriously affecting the rights of such absent party, that party is indispensable." (*Safeway Insurance Co. v. Harvey*, 36 Ill. App. 3d 388, 391, 343 N.E.2d 679, 682.) "[T]o be a necessary party, the individual or entity involved must have a present substantial interest * * * in the controverted matter such that this legal entanglement cannot be resolved without either (1) affecting that interest or (2) leaving the interest of those who are before the court in an embarrassing or inequitable position." (*Stavros v. Karkomi*, 39 Ill. App. 3d 113, 123, 349 N.E.2d 599, 607.) Cash is not a necessary party under either of these tests. We agree with Cash that plaintiff is merely attempting to relitigate the same issues. This cannot be permitted.

For the foregoing reasons the judgment of the trial court is affirmed.

Affirmed.

CARTER, P. J., and EBERSPACHER, J., concur.