DANIEL COMM, Plaintiff-Appellee, Cross-Appellant, *v.* SEYMOUR GOODMAN, Defendant-Appellant, Cross-Appellee.

(No. 55644;

First District—July 21, 1972.

848

L. Louis Karton, and Harold L. Priess, both of Chicago, for appellant.

Abrahams, Chapman & Roin, of Chicago, (Dan R. Roin, of counsel,) for appellee.

Mr. PRESIDING JUSTICE LORENZ delivered the opinion of the court:

At the conclusion of a bench trial, the court entered judgment in favor of plaintiff on both counts of a two count complaint for architectural services; $2514.42 was awarded on Count I and $12,500 on Count II.

Defendant has appealed from those judgments contending: (1) that the court erred in not sustaining his motion to strike and dismiss; (2) the Statute of Frauds is a complete defense to the action; (3) there was no agreement for future architectural services; (4) the court erred in admitting evidence to support plaintiff's theory that he could recover on an implied contract; (5) the court erred in assessing plaintiff's damages on Count II; and (6) the judgment of the court on Count II is contrary to the manifest weight of the evidence. On his cross-appeal, plaintiff contends: (1) that the court erred in not allowing him to introduce evidence relating to facts which arose subsequent to the date upon which this suit was filed; and (2) the court erred in denying him recovery for the full amount of the profit which he would have earned had he been allowed to fully perform his alleged contract with defendant.

Plaintiff, an architect and developer, had experience in both the architecture and development of various kinds of projects. Defendant was a real estate developer, with limited experience. Generally, the task of a developer is to complete the exploratory work on a project, determine its requirements and, if an apartment project is contemplated, the number, mix, size and appurtenances of the apartments must also be determined. This information is then given to the architect who develops the preliminary, working, mechanical and structural drawings. The architect also takes part in the supervision and general management of the project.

Through a mutual acquaintance, plaintiff met defendant sometime in 1964. They went to Joliet for the purpose of viewing a hotel property which defendant was thinking of developing. Although defendant testified that it was not until 1965 that he and plaintiff discussed the site of the old St. Joseph Hospital, which had been abandoned when the hospital moved to new quarters, plaintiff testified that they discussed the site several times during 1964, the first time being when they went to view the hotel property.

Early in 1965 plaintiff and defendant met and agreed upon the soundness of the St. Joseph Hospital project. Plaintiff testified that at that meeting defendant said, "as a result of [plaintiff's] aid in this development, that [plaintiff] could participate at any time in the equity position going further down the road when [plaintiff] wished to." Defendant also testified that any talk of a partnership relationship related to projects other than that at the hospital site. Further, defendant testified that he only consulted plaintiff to see if he had any idea about the possible development of the hospital property.

Plaintiff's version of his activities with respect to the development indicates that his role was more than that of a consultant. He testified

that he did the developmental work on the project. He visited housing facilities in the area, determined the rental market, vacancy rate and rentals and in looking at comparable apartment units he determined the appurtenances which were offered with those units. In general he determined what the site should contain. He prepared a projection of operating expenses by determining the expected real estate tax, utility expense, janitorial expense, withholding tax and other factors. Plaintiff attended various meetings with a former official of Will County, an attorney who was experienced in F.H.A. matters and a mortgage broker. As a result of meetings with the mortgage broker an application was made to the F.H.A. That application was approved in the amount of $1,800,000, but it was later cancelled by the F.H.A. These developmental services were valued at $15,000 by plaintiff and $10,000 by a real estate appraiser and consultant called upon to testify by plaintiff.

During March, April and May of 1965 several more discussions of the project were held and on June 17, 1965, plaintiff sent defendant the following letter.

"As you requested, this letter will confirm the purposes of our impending meeting on next Monday.

In the many months of our relationship you have always assured me of at least the complete architecture that could result as a result of the time I have spent. In addition we also have talked of promotional or partnership relationships. Thus far no money has changed hands between ourselves mutually in accord, and the work involved to date for my office has been my time and knowledge.

Our discussion Monday will be toward cementing a relationship that can be put in writing. Probably the eventual relationship will be contingent upon the project proceeding. Therefore in order to limit your exposure in the event the project should fail our contingent fee will be on the basis of the direct personnel expense plus overhead."

At the meeting referred to in the above letter defendant told plaintiff, "It's time to take the next step. We have to take the next step, but I want to limit my liability in the event for some reason it doesn't proceed past the next step." (The next step was the submittal of preliminary plans to the F.H.A. and the securing of a credit letter.) Defendant further stated, "I want to minimize my exposure in the event we don't go ahead. Therefore, I want to know how much it's going to cost for this expenditure, and I think it should be at your cost." Plaintiff responded, "Fine, it will be at my cost because I don't want to create a hardship for you. It will be at my office cost, cost plus 25 percent, which doesn't include any profit, plus duplication. We will not be able to spell out any final percentage fee, since we don't know at this point." Plaintiff testified

that it was agreed that all of the terms of the contract were to be as in the standard American Institute of Architects B 131 contract. The only term left open was the percentage of the fee which was to be five percent if conventional financing was obtained and six percent if financing was made through the F.H.A. Plaintiff further indicated that the architectural fee was to be his compensation for the developmental work. Defendant, however, testified that he never discussed the architectural fee with plaintiff.

Up until the time of the meeting plaintiff had not drawn the preliminary design but his staff was oriented to the project and immediately after the meeting the staff was instructed to prepare the preliminary submittals. A survey, which defendant instructed plaintiff to order, was made and delivered to defendant.

On June 24, 1965 plaintiff sent the following letter to defendant.

"In accordance with our conference Monday and the verbal agreement that followed, our office has begun study of the site which will lead to a completed design and preliminary plan submittal. This preliminary plan will be suitable for mortgage submittal to the FHA as well as a conventional lender and will describe 144 apartments and their relations both horizontal and vertical to the site. Our fee for this plan will be on the basis of direct personnel expense plus 25% for overhead and will not exceed $2,500.00. When the project proceeds this amount will apply within the basic fee we ultimately agree upon. Duplication or any out of pocket expense will be charged for separately. If colored renderings are required these will be also charged for separately.

We have ordered in your behalf a complete survey of the site for the National Survey Company. The cost of same will be not in excess of $1,000.00 and will be involved directly.

I attach one copy of the estimated prospectus I prepared which can be used by yourself as a guide for creating others. I would suggest you take a trip to Joliet and verify some of the expenses. The indicated mortgage amount should be verified by a friendly mortgage banker. Next, I will set the deal up on an FHA D3-221 basis for comparison sake.

It occurs to me in closing we have never received a brochure from Cookie of his girlfriend's apartment."

Plaintiff's staff completed the "Preliminary Plan and Completed Design Study" which, at defendant's request, was forwarded to the mortgage broker in late July. In conjunction with the agreement referred to in the letter of June 24, plaintiff gave defendant a bill in the amount of $2,514.42, $14.42 being for duplicating expenses. Defendant offered

plaintiff a check for that amount if he would sign a release and general waiver. Plaintiff refused and defendant said he had entered into an agreement with other investors and as a result of that agreement plaintiff's employment was terminated. This was explained in a letter from defendant to plaintiff dated August 23, 1965, which reads as follows:

"The undersigned has now made an association with another sponsor and/or investor in the development of the property known as St. Joseph's Apartments in Joliet, Illinois. Thus the undersigned is no longer solely in control of the procedure in the development of this project. Therefore, in view of these developments and because of the verbal agreement between us, I find it no longer feasible nor possible to proceed with any further work through your office.

After submitting your letter of June 24, 1965 and placing all of the facts before counsel it is clear that my obligations to you are such that you are to be compensated for the amount of work and expenses had. Since under date of August 1, 1965 you issued your statement for services rendered through July 29, 1965 and nothing further has been done, the undersigned stands ready to pay you said amount to-wit $2,514.42 as previously been tendered to you under check No. 101 dated August 18, 1965. I again stand ready at any time to pay this sum to you upon receipt in accordance with usual custom and procedure of a waiver of lien and release for all services rendered to date."

An offer of proof made by plaintiff established that an application for project mortgage insurance was made to the F.H.A. on June 19, 1967. The application listed the sponsors as American National Bank and Trust Company, Trust Number 22166, Seymour Goodman, Jordan H. Kaiser and Walter R. Kaiser. The architects were Raggi and Schoenbrod and their fee was listed at $74,330. Since the application was accepted and the architect's fee was allowed, the payment of a lesser fee would have been contrary to F.H.A. rules. The project was completed in mid-1969.

■■ If plaintiff is to recover on Count I, for breach of contract, he must establish that the parties entered into a contract. He must demonstrate that there has been a meeting of the minds. (*Euclid Engineering Corp. v. Illinois Power Co.* (1967), 79 Ill.App.2d 145, 152, 223 N.E.2d 409, 413; I.L.P. Contracts, par. 31.) The evidence firmly establishes, as evidenced by the letters of June 24 and August 23, that there was agreement between the parties for plaintiff to complete the preliminary plan, the compensation for which was not to exceed $2,500 plus duplication expense. This was so found by the trial judge as indicated in his written order. However, the trial judge also found that the proof failed to establish the existence of a contract for further services in regard to the

project. Plaintiff contends in his cross-appeal that this latter finding was against the manifest weight of the evidence.

██ As stated in *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill.2d 352, 356, 226 N.E.2d 624, 626:

"Although a trial court's holding is always subject to review, this court will not disturb a trial court's finding and substitute its own opinion unless the holding of the trial court is manifestly against the weight of the evidence. (*Brown v. Zimmerman*, 18 Ill.2d 94, 102; *Illinois Nat. Bank & Trust Co. of Rockford v. County of Winnebago*, 19 Ill.2d 487, 495; *Mortell v. Beckman*, 16 Ill.2d 209.) Underlying this rule is the recognition that, especially where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. We may not overturn a judgment merely because we might disagree with it or might, had we been the trier of facts, have come to a different conclusion."

For a judgment to be against the manifest weight of the evidence an opposite conclusion must be clearly evident. (*Hulke v. International Manufacturing Co.* (1957), 14 Ill.App.2d 5, 45, 142 N.E.2d 717, 738.) Plaintiff's letter of June 17 reveals that the parties were at that time only in the talking or negotiation stage and they anticipated getting together to "cement" an agreement. The only change in this situation indicated by the letter of June 24 was with regard to the preliminary plan. In a like manner, the other evidence of record does not indicate that the parties progressed beyond the talking stage with respect to anything other than the agreement for that preliminary plan. Thus, the judgment of the trial court on Count I was not against the manifest weight of the evidence.

██ Having accepted the trial court's determination that plaintiff failed to establish a contract for future architectural services, we turn to consideration of whether, plaintiff established a ground for recovery under a theory of implied contract. The law relating to this type of contract was recently summarized in *First National Bank of Lincolnwood v. Glenn* (1971), (Ill.App.2d), 270 N.E.2d 493, 495 where the court stated:

"An implied contract is an obligation created by law independent of an agreement of the parties. It arises out of the acts and conduct of the parties—out of circumstances from which the intent to contract can be inferred. Board of Highway Commissioners v. Bloomington, 253 Ill. 164, 97 N.E. 280 (1911). In *Highway* the court gave the following example of an implied contract.

[W]here one person, in the absence of any express agreement, renders valuable services to another, which are knowingly accepted by such other, the law will imply a promise to pay a fair and reasonable compensation for such services.

A contract implied in law is equitable in its nature and is one which reason and justice dictate. It does not arise from an intent to contract or a promise to pay. It exists where there is a plain duty and a consideration. The consideration may be a parting with something by the party seeking to enforce the contract; the promise is presumed so that there will not be a failure of justice. Its essential element is the receipt of a benefit by one party which would be inequitable for that party to retain. It is predicated on the fundamental principle that no one should unjustly enrich himself at another's expense. [Citations]."

■■ In the present case the evidence discloses the extensive developmental work done by plaintiff in his attempt to determine the feasibility of the project and its expected gross revenue, expenses and profit. The trial judge found that "the preponderance of the evidence is that the plaintiff rendered services with the knowledge of the defendant; that he accepted the benefit of them." We do not believe that this is an appropriate case to reverse the determination of the trial judge in that regard. (*See Schulenburg v. Signatrol, Inc.,* supra, and *Hulke v. International Manufacturing Co.,* supra.) Defendant urges that the circumstances surrounding the rendition of the developmental services were such that payment therefor was not expected. In support of this theory he cites *Mc Roberts v. Estate of Kennelly* (1964), 52 Ill.App.2d 34, 201 N.E.2d 680. That case stands for the proposition that the circumstances of a given case may indicate that services may be rendered gratuitously and not thereby give rise to an implied contract. Such is not the situation in the instant case. There is no course of dealing, no family relationship, or long standing friendship or any of the other factors which lead to the court's decision in *Mc Roberts* that the services were rendered gratuitously.

■■ Defendant lastly contends that the court erred in assessing plaintiff's damages on Count II at $12,500. He contends that the amount awarded was a compromise between the two estimates in evidence of the value of plaintiff's services and that there was no basis for the court's determination in this regard. The law in this regard is aptly stated at 25 C.J.S. Damages, par. 74 where it is said:

"*Quasi-contract.* The measure of damages is not the same in an action for a breach of an express contract and in an action on a quantum meruit in that in the former the measure is fixed by the parties while in the latter it is fixed by law. In an action depending on the obligation

or duty called quasi-contract, the measure of the recovery is the extent of the duty or obligation imposed by law, and is expressed by the amount which the court considers defendant has been unjustly enriched at the expense of plaintiff."

Recovery is to be measured by the reasonable value of the services which plaintiff has performed. (*See generally First National Bank of Lincolnwood v. Glenn, supra,* and *Shaw v. Blessman* (1966), 67 Ill.App.2d 242, 248, 213 N.E.2d 784, 786—787.) The difficulties involved in determining the reasonableness of damages in such a case as the one at hand are discussed at 5 Corbin on Contracts, par. 1020 (1964).

■■ We have examined defendant's arguments in this regard and have found them unconvincing. The determination of the trial judge was based upon his consideration of the testimony of the witnesses as to the value of the services performed by plaintiff. While it is true that he struck a balance between those estimates, we believe that figure to be reasonable under the circumstances of this case.

As a result of the views expressed herein it is unnecessary to expressly treat the remaining arguments raised in both the appeal and cross-appeal as they are disposed of by implication.

The judgment of the circuit court is affirmed.

Judgment affirmed.

ENGLISH and STAMOS, JJ., concur.