NOTICE
Decision filed 08/20/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 200088-U

NO. 5-20-0088

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* D.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Shelby County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-JA-9 |
| | ) | |
| Tammy H. and James M., | ) | Honorable |
| | ) | Douglas L. Jarman, |
| Respondents-Appellants). | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Barberis and Overstreet concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the trial court's order finding that D.M. was a neglected minor in that she was in an environment injurious to her health, safety, and welfare was not contrary to the manifest weight of the evidence, we affirm the court's dispositional order.

¶ 2    Tammy H. and James M. appeal from the trial court's February 18, 2020, dispositional order that adjudicated D.M. as a neglected minor, made D.M. a ward of the court, and placed D.M. in the custody of the Department of Children and Family Services (DCFS). For the reasons that follow in this order, we affirm the trial court's dispositional order.

¶ 3                                    BACKGROUND

¶ 4    D.M. was born on April 17, 2013. Her mother is Tammy H. and her father is James M.

1

She has a brother, J.H., born on March 1, 2012. J.H.'s parents are also Tammy H. and James M. J.H.'s case is the subject of a separate appeal and order. See *In re J.H.*, 2020 IL App (5th) 200089-U. The children were previously in foster care from 2015 to 2016 for an incident in which Tammy admitted that she had used a controlled substance. After Tammy and James completed treatment and required classes, the children were returned to their care in May 2016. At the time of the 2019-20 DCFS involvement, Tammy and James had been together as a couple for seven to eight years, except for a brief separation while the 2015 case was pending. At all relevant times, the family resided in a small one-story house in Herrick in rural Shelby County. The house is a former gas station building and has an attic that can only be accessed with a ladder.

¶ 5    On March 4, 2019, DCFS received a hotline call about the children's welfare. The hotline reporter saw James acting erratically in the Shelby County courthouse. James was in court because of an ordinance violation connected to his four pit bull dogs. James's dogs had been picked up by Shelby County Animal Control because they were running free in the town and acting aggressively. D.M. and J.H. were in court with James even though that day was a school day. While in court, James began yelling and crying and displaying what the caller described as "up and down" emotions. James informed the court that he had bipolar disorder but that he was no longer taking the prescribed medication because he could not afford the cost.

¶ 6    Following up on the hotline call, on March 11, 2019, DCFS investigator Michelle Whitley interviewed D.M. and J.H. at the Cowden-Herrick elementary school. Whitley testified that J.H. informed her that "his dad smokes out of a glass pipe [placing] little pebbles in it that are brown and white." J.H. stated that his mom is present when his dad smokes and she does not stop him. In addition, J.H. stated that he and D.M. are not allowed to go "upstairs" in the house

2

"because that's where dad and his friends are painting." Whitley testified that D.M. informed her of "approximately the same thing."

¶ 7    Based upon the substance abuse information, Whitley's DCFS supervisor decided that D.M. and J.H. needed to be removed from their parents' home. Administrators at the elementary school asked Whitley not to approach Tammy and James on school property for the safety of school staff and children. Whitley waited until school ended on that day. Whitley asked the Shelby County sheriff's office to send an officer to assist her with the meeting with the parents because she knew that James tended to become volatile. Deputy Cody Reeves met Whitley at the children's school to provide that assistance. However, he arrived at the elementary school a little late, and Tammy and James had already left by vehicle with D.M. and J.H. At Whitley's request, Deputy Reeves pulled over the vehicle driven by James. According to Deputy Reeves, he observed no traffic violations before the stop. Upon being pulled over, James was noticeably upset. Whitley asked James to submit to an instant drug test. He refused the request. Tammy was also asked to submit to the drug test. She agreed to take the test but was disqualified because she had been smoking a cigarette. On March 11, 2019, D.M. and J.H. were taken into protective custody.

¶ 8    Two days after the children were taken into protective custody, the State filed separate petitions for adjudication of wardship. The petitions alleged that D.M. and J.H. were neglected because James used drugs in the presence of each child resulting in an environment injurious to the minor's health and welfare. See 705 ILCS 405/2-3(1)(b) (West 2016). On that same date, the trial court held shelter care hearings in both cases and ruled that there was probable cause to believe that D.M. and J.H. had suffered neglect and that there was an immediate and urgent necessity for the safety of the minors to grant DCFS temporary custody. The trial court

3

concluded that the environment was injurious to the health, welfare, and safety of the minors because James had been using drugs in the presence of the children and Tammy.

¶ 9                                    Adjudicatory Hearing

¶ 10    The adjudicatory hearing was held on May 22, 2019. Deputy Reeves and Whitley testified for the State. Tammy testified in response.

¶ 11                          *Testimony of Deputy Cody Reeves*

¶ 12    Deputy Reeves testified that he pulled over James's vehicle on March 11, 2019, at the direction of Whitley. He described James's demeanor as irrational and obnoxious. However, he stated that in the approximate 10 interactions he had previously had with James over a period of years, James was always irrational and obnoxious. He also testified that James had always been skinny and had eyes that appeared to be sunken. Deputy Reeves testified that he did not believe that James was impaired when he made the stop and did not initiate field sobriety testing as he would have done in a driving under the influence traffic stop. He handcuffed James and then placed him in the squad car because James was becoming more belligerent and Deputy Reeves was concerned for everyone's safety. He did not find any drugs or drug paraphernalia on James's person. He issued James a citation for operating an uninsured vehicle.

¶ 13                    *Testimony of DCFS Investigator Michelle Whitley*

¶ 14    Whitley testified that she interviewed both D.M. and J.H. separately on March 11, 2019, at the Cowden-Herrick elementary school. On that date, D.M. was five years old and J.H. was six years old. Both children testified that their father smoked out of a glass "bowl," containing little white and brown rocks heated with a torch. J.H. described the pebbles as being very small and being like pebbles that he could find in his yard.

¶ 15    Whitley testified about James's anger and refusal to cooperate with her after being stopped by Deputy Reeves. She informed James that D.M. and J.H. told her he was smoking drugs in their presence. She asked him to take an instant drug test, but he refused. She explained to James that if he did not comply with the drug test that she had no ability to ensure that the children were safe. Whitley testified that she had been a certified drug and alcohol substance abuse counselor for the past 18 years. During those 18 years, she had the opportunity to observe and counsel people who were under the influence of drugs. She testified that upon observing James that afternoon, she noticed that he was excessively thin, that his facial skin had a grayish tone, and that his eyes were sunken. In Whitley's opinion, these physical observations were indicative of methamphetamine usage. Tammy informed Whitley that she was not on drugs but did not know whether James was on drugs.

¶ 16    On cross-examination, Whitley acknowledged that she had not been to the home, and so had no direct knowledge to confirm the allegations made by the children. She also acknowledged that she did not ask the children how long ago they had observed their father smoking out of the glass bowl.

¶ 17    Whitley testified about past DCFS involvement with Tammy and James. She stated that there had been a July 2015 indicated DCFS report involving Tammy's ingestion of an intoxicating substance. The children were placed in protective custody from 2015 to 2016. Tammy and James completed the required services and DCFS returned the children to their care. Whitley testified that there was another DCFS report in 2017 in which both children were left unsupervised in a park for approximately one hour.

¶ 18                                          *Testimony of Tammy H.*

¶ 19    Tammy testified that James was her boyfriend and the father of her two children. She

testified that in the last six months she had not witnessed James use any illegal drugs in front of the children. She could not explain why both children independently said that they had seen their father smoking drugs while in her presence. Tammy stated that she had not used drugs in the last six months, and that she took a drug test in April 2019 that was negative.

¶ 20                    *Trial Court's Oral and Written Adjudicatory Orders*

¶ 21    At the conclusion of the hearing, the trial court found that D.M. and J.H. were neglected minors. The court stated that Whitley was trained in drug and alcohol issues, and that her opinion was that James was impaired due to drug use on March 11, 2019. The court stated that Whitley's opinion was corroborated by the individual statements made by D.M. and J.H. The court noted that the information provided by the children was remarkably similar. The court concluded that the State had met its burden to show that the children were neglected. The trial court entered its written adjudicatory order concluding that D.M. and J.H. were neglected in that they were in an environment that was injurious to their welfare based upon the "Father's drug use in front of the minor children."

¶ 22                    DCFS Reports, Integrated Assessments, and Family Service Plan

¶ 23                    *June 2019 DCFS Report to the Trial Court*

¶ 24    In the report, DCFS noted that Tammy had been cooperative. She completed the integrated assessment interview, engaged in regular visitation with her children, and had a negative drug test on April 4, 2019. Conversely, DCFS noted that James had only completed the integrated assessment interview. James struggled at visitations with his children when they were held at a DCFS office but fared better when the visitations were held at his attorney's office. DCFS asked James to take a drug test on April 4, 2019, but he refused to do so. D.M. and J.H. were both adjusting well to traditional foster placement.

¶ 25    DCFS recommended that the trial court find that the parents were unable or unwilling to care for the minor children and that it was not in the best interests of the minor children to be reunited with their parents until corrections were made to the conditions that led to their foster placement. Finally, DCFS asked the trial court to adjudge the minors as wards of the court, place custody and guardianship of the minors with DCFS, and direct the parents to cooperate with DCFS fully and completely on their service plans.

¶ 26                              *Tammy's Integrated Assessment*

¶ 27    Tammy completed her DCFS Integrated Assessment in April 2019 reporting that she was disabled and unemployed. Tammy told the screener that she believed James suffered from post-traumatic stress disorder stemming from a lengthy federal incarceration. She believed that she had the ability to calm him down. The screener found that Tammy had a relationship dependency with James "that could impact her emotional stability, availability to her children, judgment, lack of assertiveness, and her denial and avoidance of problematic family dynamics." The screener stated that Tammy's denial of the problematic family dynamics caused Tammy great difficulty in protecting her children and in assessing further safety concerns. The screener was concerned that Tammy did not seem to appreciate the impact of the family dynamic on the emotional development or safety of the children. Tammy had not missed any visitation opportunities.

¶ 28    DCFS recommended that Tammy begin individual psychotherapy, have a psychiatric consult to determine if she needed medication, and if so to comply with those recommendations, and receive parenting psychoeducation. Parenting psychoeducation was described as "parenting education regarding the nature of her children's developmental and emotional progress, including specific strategies to structure the home environment and maintain consistency and a calm environment, strategies to interrupt problem behaviors, reinforce positive behaviors, and

7

promote developmental enrichment activities." In addition, DCFS recommended four additional services: participation in children and family/team meetings; securing resources and support for a stable structured living environment; domestic violence advocacy and support; and frequent visitation with the children. However, DCFS would not mandate substantial achievement of these recommended services before reunification with her children.

¶ 29                                  *James's Integrated Assessment*

¶ 30    James also completed his DCFS Integrated Assessment in May 2019, reporting that he was self-employed working as a mechanic out of the family home. He had a criminal history involving aggravated assaults on police officers. James's understanding of the current DCFS case was that DCFS staff believed he was on drugs because of the way he acts. He would not discuss his use of drugs during the assessment other than to say that he had last consumed alcohol over 25 years earlier. James initially had supervised visitation at a DCFS office, but he had difficulty controlling his anger at the situation and those visits were discontinued. At an April 11, 2019, visit during which DCFS staff described James as being "out of control," police were ultimately called to diffuse the situation. The police searched James's vehicle and found marijuana and issued him a ticket for possession of marijuana. Thereafter, DCFS agreed to move the supervised visitations to the office of James's attorney and the visits were reported as being much improved. The screener believed that James showed signs of a serious affective disorder such as bipolar disorder and noted that James had an extremely low tolerance for frustration. Overall, the screener concluded that James had an inability to handle stress, frustration, or confrontation and that these inabilities "impeded his ability to provide for his children's safety and well-being, including supervision, discipline and meeting their daily needs." The screener expressed concern regarding the explosiveness of James's behavior and his unknown level of

8

substance abuse, stating that both unknown elements could increase safety issues.

¶ 31    DCFS recommended that James receive psychiatric and other mental health services; a substance abuse evaluation and any recommended treatment; a consultation with the DCFS domestic violence services coordinator; and after achieving maintenance of emotional control, DCFS recommended individual psychotherapy and parenting psychoeducation. In addition, DCFS recommended three additional service: participation in children and family/team meetings; securing resources and support for a stable structured living environment; and frequent visitation with the children. However, DCFS would not mandate substantial achievement of these recommended services before reunification with his children.

¶ 32                     *Family Service Plan—September 2019*

¶ 33    D.M. and J.H. had originally been in a traditional foster placement but were moved to a home of a relative, Tammy's cousin. D.M. had adjusted well to the new placement, while J.H. had not. The permanency goal of the service plan was to return the children home within 12 months. D.M. had some minor educational deficiencies in changing from one school system to another and needed eyeglasses. J.H. needed additional medical monitoring and possible testing and/or treatment for a complicated history of bowel difficulties. In addition, J.H. was academically challenged and needed an individualized education program. Both children were receiving various therapeutic interventions.

¶ 34    Tammy had followed through with DCFS recommended services and was making good progress towards the set goals. She had achieved satisfactory progress on the action steps requirements of monthly meetings with her caseworker to develop her service plan and to discuss her needs and progress, and in maintaining an active role with her children's developmental, medical, and educational meetings. Tammy was also rated as satisfactory in engaging in

9

individual psychotherapy and frequent visitation with her children. DCFS rated Tammy unsuccessful at having a psychiatric appointment and on engaging in parenting education, which DCFS noted had just begun.

¶ 35    James had success with early steps required by DCFS but was not as cooperative and successful as Tammy. James had achieved satisfactory progress in meeting with his assigned caseworker to develop his service plan and to discuss his needs and progress. His progress in participating in ongoing family/team meetings and visitation with the children was rated as satisfactory. However, DCFS rated James's progress on several services as unsatisfactory because the services had either just started or had not yet begun. James agreed to cooperate with DCFS by participating in psychiatric services, mental health services, substance abuse services, domestic violence services, and parenting psychoeducational services. DCFS rated James's progress on cooperation with random drug tests as unsatisfactory. James had not allowed DCFS workers inside his home, and, as such they were unable to assess whether the home was safe and stable for the children.

¶ 36                  *February 2020 DCFS Report to the Trial Court*

¶ 37    In the report, DCFS noted that Tammy was engaged in mental health treatment and her therapist concluded that she was not in need of psychiatric services. Tammy continued to use all opportunities to see her children. James was getting closer to having his own mental health treatment. James had an issue of insurance and his caseworkers reported that this issue was close to resolution after which he would receive a mental health assessment. James used all opportunities to see his children. Since the last report, DCFS had arranged to have James transported for a random drug test, but the transportation pickup time conflicted with a court appearance so the drug test was not completed. On a DCFS visit to the home, Tammy and James

10

reported that Shelby County Animal Control had returned three of their dogs after previous removal for running loose in the neighborhood. Tammy and James informed DCFS that the dogs were friendly with family.

¶ 38 A DCFS worker visited the home two times and concluded that the home was not currently appropriate for the children, but Tammy was working with a community agency to obtain assistance in making the necessary improvements. D.M. continued to do well in the relative foster placement. J.H. continued to struggle in that he had several education and medical issues. DCFS determined that J.H. was eligible for specialized foster care, meaning that there would be increased contact by a caseworker and J.H. would receive additional services.

¶ 39 DCFS made the same recommendations to the trial court as it did in its original report. DCFS recommended that the trial court find that the parents were unable or unwilling to care for the minors. DCFS stated that it did not believe that returning the children to their parents would be in the minors' best interests. DCFS recommended the same permanency goal—to return the children to their parents within one year. Finally, DCFS asked the trial court to make D.M. and J.H. wards of the court, to grant guardianship and custody of the minors to DCFS, and to direct the parents to cooperate fully and completely with DCFS on satisfaction of the service plan.

¶ 40 Dispositional Hearing

¶ 41 On February 18, 2020, the trial court held the dispositional hearing and entered its order. The trial court indicated that it had reviewed both of DCFS's reports and found them to be helpful. The court's order found that Tammy and James were unable and unwilling to correct the conditions which led to the placement of the children. The trial court adjudicated D.M. and J.H. as neglected, made D.M. and J.H. wards of the court, and placed custody and guardianship of D.M. and J.H. with DCFS.

11

¶ 42                                    ANALYSIS

¶ 43    Here, Tammy and James appeal the finding in both the adjudicatory and dispositional orders that D.M. is a neglected minor. An adjudicatory order is not a final and appealable order. *In re M.J.*, 314 Ill. App. 3d 649, 655, 732 N.E.2d 790, 795 (2000). Instead, in juvenile cases, the dispositional order is the final order from which a party can appeal. *Id.* Accordingly, "[a]ppealing a dispositional order is the proper vehicle for challenging a finding of abuse or neglect." *In re Leona W.*, 228 Ill. 2d 439, 456, 888 N.E.2d 72, 81 (2008). To properly perfect an appeal, an appellant must file a notice of appeal within 30 days after the entry of a final order. Ill. S. Ct. R. 303(a) (eff. May 30, 2008). The dispositional order was entered on February 18, 2020. James filed his notices of appeal on March 11, 2020, while Tammy filed her notices of appeal on March 16, 2020. Accordingly, we have jurisdiction to hear this appeal.

¶ 44    On appeal from a dispositional order, the reviewing court will not reweigh the evidence or reassess the credibility of the witnesses. *In re April C.*, 326 Ill. App. 3d 245, 257, 760 N.E.2d 101, 111 (2001). We will not reverse the trial court's decision unless the findings of fact are against the manifest weight of the evidence. *In re J.W.*, 386 Ill. App. 3d 847, 856, 898 N.E.2d 803, 811 (2008); *In re Arthur H.*, 212 Ill. 2d 441, 464, 819 N.E.2d 734, 747 (2004). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 45    At issue in this case is the trial court's finding of neglect. The State must prove that a minor is neglected by the preponderance of the evidence. *In re April C.*, 326 Ill. App. 3d at 257; *In re R.S.*, 382 Ill. App. 3d 453, 459, 888 N.E.2d 542, 548 (2008). Neglect is defined as "the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty." *In re Kamesha J.*, 364 Ill. App. 3d 785, 792-93, 847

12

N.E.2d 621, 628 (2006). The term "neglect" does not have a narrow definition and must take its content from the specific circumstances of each case. *In re Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346, 730 N.E.2d 1086, 1091 (2000)). The issue at an adjudicatory hearing is "whether or not a child is neglected, and not whether every parent is neglectful." *Id.* at 467. In other words, if there is proof by a preponderance of the evidence that D.M. and J.H. were neglected by either Tammy or by James, that evidence is sufficient to establish that the minors were neglected.

¶ 46    Here, the trial court found that the minors were neglected because they were in an environment injurious to their health based upon the "Father's drug use in front of the minor children." The term "injurious environment" is not a term that has a precise definition. *Id.* at 463. Generally, the term "has been interpreted to include 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Id.* (quoting *In re N.B.*, 191 Ill. 2d at 346). As a result of the indeterminate concepts of "neglect" and "injurious environment," each case must be decided based upon its own unique facts and circumstances. *Id.*

¶ 47    Tammy and James first contend that the trial court should not have accepted the hearsay statements of D.M. and J.H., via DCFS investigator Michelle Whitley's testimony, as establishing neglect because the statements were not effectively corroborated. "Corroboration is particularly important given the fact that the minor who made the statement will not be subject to cross-examination." *In re A.P.*, 179 Ill. 2d 184, 197, 688 N.E.2d 642, 649 (1997).

¶ 48    The State counters that because Tammy and James failed to object to the admission of the statements of D.M. and J.H. through investigator Whitley, they forfeited any claim that the testimony of the children constituted inadmissible hearsay. See *In re April C.*, 326 Ill. App. 3d at 242.

13

¶ 49    Because Tammy and James forfeited their hearsay claim, the only way that this court could consider the issue is through a plain-error analysis. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *People v. Naylor*, 229 Ill. 2d 584, 593, 893 N.E.2d 653, 659 (2008). The plain-error doctrine would allow a reviewing court to consider an unpreserved error if "(1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). However, Tammy and James did not ask this court to consider the issue as plain error. The State contends that by failing to present an argument on either of the two prongs of the plain-error doctrine, any argument is forfeited. *People v. Hillier*, 237 Ill. 2d 539, 545-46, 931 N.E.2d 1184, 1188 (2010); *In re S.J.*, 407 Ill. App. 3d 63, 66, 943 N.E.2d 174, 177 (2011).

¶ 50    Although Tammy and James forfeited their hearsay argument by failing to object to the hearsay arguments in the trial court and failing to allege plain error in this appeal, this court must first determine whether any error occurred at all. *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1059 (2010). To determine if any error occurred, we must conduct a substantive review of the issue raised. *People v. Walker*, 232 Ill. 2d 113, 125, 902 N.E.2d 691, 697 (2009). If we find that there was no clear or obvious error, then we do not need to engage in a plain-error analysis. *People v. Wright*, 2017 IL 119561, ¶ 87, 91 N.E.3d 826, 887; *Walker*, 232 Ill. 2d at 124-25.

¶ 51    Turning now to the substance of the issue Tammy and James raise on appeal, we find guidance on the issue of evidence of neglect in section 2-18 of the Juvenile Court Act of 1987.

14

705 ILCS 405/2-18 (West 2016). "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence." *Id.* § 2-18(4)(c). Prior statements made by a minor are admissible hearsay so long as there is corroboration. *In re A.P.*, 179 Ill. 2d at 197. We also note that section 2-18(3) has possible application to the facts of this case: "In any hearing under this Act, proof of the *** neglect *** of one minor shall be admissible evidence on the issue of the *** neglect *** of any other minor for whom the respondent is responsible." 705 ILCS 405/2-18(3) (West 2016).

¶ 52    Here, the trial court found that the statements of D.M. and J.H. were corroborated by the opinion testimony of Whitley at the adjudicatory hearing. That same evidence was referenced by the trial court in its order on the record at the conclusion of the dispositional hearing. Whitley provided testimony about her certification as a counselor in drug and alcohol substance abuse and her years of experience in the field. Based upon James's physical appearance and his behavior that night, she opined that he was under the influence of some sort of an amphetamine. The trial court found that Whitley's testimony was sufficient based upon her experience and expertise.

¶ 53    In addition to the corroboration provided by Whitley, we find that the independent claims made by D.M. and J.H. were corroborated by each minor's separate statements made to Whitley. In other words, the statement of D.M. about her father's drug use in her presence was corroborated by the statement of J.H. about his father's drug use in his presence. See *In re Alexis H.*, 401 Ill. App. 3d 543, 561, 929 N.E.2d 552, 568 (2010) (finding that "the children's statements of sexual abuse corroborated each other's statements and those statements make it more probable that the children were abused"). At the time of the interviews, D.M. was five years old and J.H. was six years old. Each child told Whitley that they had observed James

15

smoking from a glass bowl containing brown and white pebbles. The details provided by each young child were consistent. D.M. and J.H. had no advance knowledge that they would be asked about their father, and therefore had no reason to ensure that their statements and answers to Whitley's questions would match.

¶ 54    We conclude that there was no error in this case resulting from the trial court's admission of the hearsay statements of D.M. and J.H. Thus, we do not need to engage in plain-error review.

¶ 55    We find further support for the trial court's conclusion that D.M. and J.H. were neglected minors based upon Whitley's testimony at the adjudicatory hearing about the night that D.M. and J.H. were taken into protective custody. She testified that James repeatedly refused an instant drug test despite her explanation to him that without the test she could not assume that the children would be safe in his care. By refusing the opportunity to prove that he was not under the influence, his actions only served to harm his case. We can affirm a trial court's decision on any basis that appears of record. *People v. Huff*, 195 Ill. 2d 87, 91, 744 N.E.2d 841, 843 (2001); *People v. Yarber*, 279 Ill. App. 3d 519, 524, 663 N.E.2d 1131, 1134 (1996).

¶ 56    Tammy and James alternatively claim that Deputy Reeves and Whitley provided inconsistent testimony about whether James appeared to be under the influence of drugs on March 11, 2019. Deputy Reeves testified that he saw no signs of impairment and had no reason to conduct field sobriety tests relevant to a possible charge for driving under the influence. While Deputy Reeves did not see evidence sufficient to require field sobriety testing or a DUI arrest, that same evidence can be sufficient in a DCFS setting. Each witness was looking at the situation from different perspectives. Whitley was concerned for the welfare of the minors and approached the situation from a DCFS perspective, while Deputy Reeves was asked questions related to a criminal perspective—whether he observed sufficient facts to pursue a DUI investigation and

16

arrest. We do not agree that the testimony of Deputy Reeves nullified the testimony of Whitley. James's volatile behavior and appearance may not have been consistent with criminal drug or alcohol impairment but were consistent with drug impairment in the experience of a certified substance abuse professional. Furthermore, we find that it is important to stress that the trier of fact is in a better position to observe the witnesses, weigh the evidence presented, assess the credibility of the witnesses, resolve any conflicts in the testimony, and draw inferences from the facts. *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876, 885; *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112, 1115. Therefore, we will not substitute our judgment for that of the trial court on questions involving the weight of the evidence or the credibility of the witnesses. *Id.*

¶ 57    Tammy and James next claim that the statements of D.M. and J.H. were unreliable and consideration of their statements violated due process. As stated earlier in this order, we find that the statements D.M. and J.H. gave to Whitley served as corroboration for each other. *In re Alexis H.*, 401 Ill. App. 3d at 561. Furthermore, the trial court's statements reflect careful consideration of Whitley's testimony, expertise, and experience. We will not disturb a judgment delivered following a bench trial that is at least partly based upon witness credibility unless the judgment is contrary to the manifest weight of the evidence. *Jackson v. Bowers*, 314 Ill. App. 3d 813, 818, 731 N.E.2d 1252, 1257 (2000). For the reasons stated earlier in this order, we do not find that the opposite conclusion—that D.M. is not a neglected minor—is evident or appropriate. *Comm v. Goodman*, 6 Ill. App. 3d 847, 853, 286 N.E.2d 758, 763 (1972).

¶ 58    Tammy and James also argue that there is no evidence that whatever drug James may have smoked causes intoxication or impairment, that there is no evidence that James has an ongoing pattern of drug use, and that periodic use of drugs does not constitute neglect. We

17

disagree with these arguments. Whitley is a certified substance abuse counselor with years of practical field experience. Based upon her training and experience, she determined that on March 11, 2019, James's physical appearance, coupled with his emotional and irrational behavior, reflected an amphetamine-based impairment. Furthermore, on March 11, 2019, and April 4, 2019, James was asked to voluntarily agree to take a drug test. On both occasions, James refused. His two conscious decisions to refuse testing served to harm his case, even though he had not been court-ordered to do so and DCFS had not yet mandated that James follow a service plan objective of submission to random drug tests. James could have refused to take the drug tests for different reasons. One potential reason for refusal was that he thought he would test positive. In the various phases of DCFS involvement with a family, failing to submit to a requested drug test can have negative implications. See, *e.g.*, *In re Chance H.*, 2019 IL App (1st) 180053, ¶ 19, 139 N.E.3d 88, 93 (where DCFS counted a respondent parent's refusal to take a drug test as a positive result); *In re Angela D.*, 2012 IL App (1st) 112887, ¶ 32, 972 N.E.2d 215, 221-22 (where the appellate court found support for the trial court's conclusion that the respondent parent maintained an ongoing pattern of drug usage and was an unfit parent because she failed to appear for four scheduled drug tests). We also note that when police were called to intervene in a disruptive visitation on April 11, 2019, James's vehicle was searched, the police found marijuana, and the police cited James for possession of marijuana.

¶ 59     Finally, Tammy and James contend that even if James was impaired because of drug usage, D.M. and J.H. were not "neglected minors" because Tammy was sober. Section 2-18(1) of the Juvenile Court Act of 1987 states: "At the adjudicatory hearing, the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2016). This furthers the "purpose and policy of the Juvenile Court Act, which is to ensure

18

the best interests and safety of the child." *In re Arthur H.*, 212 Ill. 2d at 467 (citing 705 ILCS 405/1-2 (West 2000)). The Act does not instruct the court to determine whether the parents were neglectful at the adjudicatory hearing because the focus is on the children. *Id.* As the Illinois Supreme Court noted in *In re Arthur H.*:

> "A contrary result would lead to the unacceptable proposition that a child who is neglected by only one parent would be without the protections of the Act. Similarly, a child would have no protection under the Act if the child were neglected, but it could not be determined which parent's conduct cause the neglect." *Id.*

Accordingly, we find that this argument is without merit at the adjudicatory hearing stage.

¶ 60 In conclusion, we find no error in the trial court's findings and judgments. The trial court has wide latitude in considering any evidence that is relevant and helpful to the court's determination of a proper disposition. *In re April C.*, 326 Ill. App. 3d at 261. We find that the State established by a preponderance of the evidence that D.M. is neglected and in an environment injurious to her health, safety, and welfare. *Id.* at 257; *In re R.S.*, 382 Ill. App. 3d at 459. Accordingly, the trial court's order concluding that D.M. is neglected was not against the manifest weight of the evidence. See *In re Arthur H.*, 212 Ill. 2d at 464; *In re J.W.*, 386 Ill. App. 3d at 856; *In re Christopher S.*, 364 Ill. App. 3d 76, 89, 845 N.E.2d 830, 841 (2006). Accordingly, we affirm the dispositional order of the Shelby County circuit court.

¶ 61                                    CONCLUSION

¶ 62 For the foregoing reasons, we affirm the judgment of the Shelby County circuit court.


¶ 63 Affirmed.